# In the
# United States Court of Appeals
### For the Second Circuit

—————————————

August Term 2018

No. 17-3481-cv; 17-3918-cv

TWEED-NEW HAVEN AIRPORT AUTHORITY,

*Plaintiff-Appellant,*

CITY OF NEW HAVEN,

*Intervenor Plaintiff-Appellant,*

v.

WILLIAM TONG, *in his official capacity as Attorney General for the State of Connecticut,*

*Defendant-Appellee.**

—————————————

Appeal from the United States District Court
for the District of Connecticut
No. 15 Civ. 1731 (RAR), Robert A. Richardson, Magistrate Judge, Presiding.
(Argued: December 12, 2018; Decided: July 9, 2019)

Before:    SACK, PARKER, and CHIN, *Circuit Judges.*

_____

* The Clerk of Court is respectfully directed to amend the official caption as indicated above.

Plaintiff-Appellant Tweed-New Haven Airport Authority ("Tweed"), seeking to expand its primary runway, sued to invalidate a Connecticut statute that had limited the runway's length. *See* Conn. Gen. Stat. § 15-120j(c). Tweed contended that the statute was preempted by the Federal Aviation Act, 49 U.S.C. § 40101 *et seq*. The United States District Court for the District of Connecticut (Richardson, *Magistrate Judge*), concluded that (1) Tweed lacked standing; and (2) assuming Tweed had standing, the Federal Aviation Act did not preempt the statute. We disagree. Accordingly, we reverse and remand for entry of judgment in favor of Tweed.

**REVERSED** and **REMANDED**.

Hugh I. Manke, John C. King, Christopher A. Klepps, Updike, Kelly & Spellacy, P.C., Hartford, Ct., *for plaintiff-appellant Tweed-New Haven Airport Authority.*

John Rose, Jr., Corporation Counsel, New Haven Office of the Corporation Counsel, New Haven, Ct., *for intervenor plaintiff-appellant Tweed-New Haven Airport Authority.*

Drew S. Graham, Assistant Attorney General, Hartford, Ct., *for defendant-appellee William Tong, Attorney General of the State of Connecticut.*

BARRINGTON D. PARKER, *Circuit Judge*:

Tweed-New Haven Airport is located in the Town of East Haven and the City of New Haven, Connecticut. The Airport is owned by the City of New Haven and leased to and operated by Tweed-New Haven Airport Authority ("Tweed").[1] Tweed sued the then Connecticut Attorney General George Jepsen in his official capacity[2] (the "State"), seeking a declaratory judgment that a Connecticut statute (the "Runway Statute" or "Statute") that limits the Airport's runway to its current length of 5,600 feet was invalid. *See* Conn. Gen. Stat. § 15-120j(c). Tweed claimed that the Statute was preempted by federal laws governing

---

[1] Tweed is "a body politic and corporate" created through legislation by the state of Connecticut. *See* Conn. Gen. Stat. § 15-120i(a). While its originating statute describes Tweed as a "public instrumentality and political subdivision" of Connecticut, it "shall not be construed to be a department, institution or agency of the state." *Id.* It has a fifteen-member board of directors, comprised of persons appointed by the mayor of New Haven, the mayor of East Haven, and the South Central Regional Council of Governments. *Id*. § 15-120i(b). If Tweed is terminated, its rights and property pass to the City of New Haven. *Id*. § 15-120i(e).

[2] Since the inception of the suit, the identity of the Connecticut Attorney General has changed from George Jepsen to William Tong. This change is reflected in the case caption.

the regulation of air transportation, including the Federal Aviation Act

("FAAct"), *see* 49 U.S.C. § 40101 *et seq.*

Following a bench trial in the United States District Court for the District of Connecticut (Richardson, *M.J.*),[3] the court concluded that Tweed lacked standing to sue because its injury was not caused by the Statute and that, assuming Tweed could establish standing, the Runway Statute was not preempted by the federal laws to which Tweed cited. Because we conclude that Tweed has standing and that the Runway Statute is preempted by the FAAct, we reverse.[4]

**BACKGROUND**

The Airport serves the New Haven area. It has a catchment area—the area from which an airport expects to draw commercial air service passengers—in excess of 1,000,000 people. The Airport's primary runway, Runway 2/20, is currently 5,600 feet long. The runway is one of the shortest commercial airport runways in the country, and it is the shortest runway for an airport with a

[3] The parties consented to proceed before a magistrate judge through the entry of final judgment. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

[4] The salient facts are not in dispute and have been stipulated to by the parties. *See* Joint App'x 51-66.

catchment area as large as Tweed's area. The Airport's catchment area is the largest catchment area without nonstop flights to Orlando, and there are no flights at the Airport to a number of East Coast cities such as Boston, Washington D.C., and Atlanta.

In 2009, the Connecticut legislature, seeking to prevent the expansion of Runway 2/20, passed the Runway Statute, which provides that "Runway 2-20 of the airport shall not exceed the existing paved runway length of five thousand six hundred linear feet." Conn. Gen. Stat. § 15-120j(c). The Runway Statute prevents Tweed from extending Runway 2/20 past its current length.

The short length of the Airport's runway has sharply limited the availability of safe commercial air service at Tweed. The length of a runway has a direct bearing on the weight load and passenger capacity that can be handled on any given flight. For example, at the time of trial, American Airlines, the one commercial airline providing service to and from the Airport, was unable to safely fill its planes to capacity and was required, depending on the weather, to leave between four and nine seats empty.

Tweed has been unable to attract new airline services. Tweed has contacted approximately ten different airlines and has been unable to convince them to operate out of the Airport. One airline, Allegiant Air, LLC, began an economic analysis of the feasibility of bringing additional flights to the Airport but concluded it would be pointless to continue with the analysis unless the runway were extended.

Lengthening the runway would allow for the safe use of larger aircraft, allow flights with no seating restrictions, allow more passengers on each airplane, and allow service to more destinations. It would also allow Tweed to attract more carriers and expand the availability of safe air service for its customers.

As required by the Federal Aviation Administration ("FAA"), Tweed has prepared a Master Plan for upgrading its airport, which includes extending the runway.[5] In 2002, the Master Plan—including the runway expansion—was

---

[5] A Master Plan is required by the FAA for each commercial airport within its jurisdiction, such as Tweed, and represents a blueprint for the long-term development goals of the airport's facilities.

approved by the FAA and by the State of Connecticut. However, in 2009, the State changed its position and passed the Runway Statute.

Tweed, seeking to lengthen the runway, sued for prospective injunctive relief, contending that federal law including the FAAct preempted the Runway Statute. The City of New Haven intervened as an additional plaintiff. The State moved to dismiss on several grounds, including that Tweed lacked Article III standing, that, as a political subdivision of the State of Connecticut, Tweed could not sue the State, and that the Runway Statute was not preempted. The District Court denied the State's motion.

At trial, the parties largely relied on a joint stipulation of facts. The District Court ultimately concluded that (1) Tweed lacked standing to sue because it had not shown an injury-in-fact and causation attributable to the Statute; and (2) even if Tweed had standing, federal law (including the FAAct) did not preempt the Runway Statute. *See generally Tweed-New Haven Airport Auth. v. Jepsen*, No. 15-cv-01731, 2017 WL 4400751, 2017 LEXIS 162356 (D. Conn. Oct. 3, 2017).

Tweed raises both these issues on appeal and the State contends, as it did below, that Tweed cannot sue Connecticut because it is a political subdivision of

the State. We review each of these questions *de novo*. *Montesa v. Schwartz*, 836 F.3d 176, 194 (2d Cir. 2016) (standing); *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (per curiam) (preemption).

**DISCUSSION**

**I.**

To establish Article III standing, a plaintiff must prove: "(1) injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-107 (2d Cir. 2008) (emphasis omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Each of these elements "must be supported adequately by the evidence adduced at trial." *Lujan*, 504 U.S. at 561 (internal quotation marks and

citation omitted). Based on the facts at trial, we conclude that Tweed meets each of these requirements.[6]

First, we have little difficulty concluding that Tweed suffered an injury-in-fact. Where, as here, "the plaintiff is himself an object of the action (or forgone action) at issue . . . , there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62. The Runway Statute directly targets Tweed and prevents it from extending its runway.

In addition, Tweed has established that it is injured by the threatened enforcement of the Statute should Tweed attempt to extend the runway. The State claims that standing is not available under this theory because Connecticut has made no overt threat to enforce the Statute. Crediting this argument would run afoul of the Supreme Court's admonition not to put "the challenger to the choice between abandoning his rights or risking prosecution." *MedImmune, Inc. v.*

---

[6] Only one party must have standing to seek each form of relief. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Because Tweed and the City of New Haven seek the same relief, we do not separately discuss the standing of the City.

*Genentech, Inc.*, 549 U.S. 118, 129 (2007) (internal quotation marks omitted). The very purpose of the Declaratory Judgment Act was to avoid requiring a litigant to confront this dilemma. *Id.*

When courts consider whether the threatened enforcement of a law creates an injury for the purposes of standing, "an actual . . . enforcement action is not a prerequisite to challenging the law"; a pre-enforcement challenge is sufficient. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *see MedImmune*, 549 U.S. at 128-29; *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 234 (2010). Where a statute specifically proscribes conduct, the law of standing does "not place the burden on the plaintiff to show an intent by the government to enforce the law against it. Rather, it [has] presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013). The record in this case shows no such disavowal.

Second, Tweed has demonstrated that its injury is caused by the Runway Statute. For standing purposes, a plaintiff is required only to show that the injury "is fairly traceable to the challenged conduct of the defendant." *Spokeo, Inc. v.*

*Robins*, 578 U.S. ___, 136 S. Ct. 1540, 1547 (2016). Where, as here, a plaintiff is threatened by the enforcement of a statute that specifically targets the plaintiff, the requirement is met. *Lujan*, 504 U.S. at 561-62. The Runway Statute is a solid barrier to extension of the Airport's runway. Nothing can happen while the Statute is in place. Tweed's injury is, therefore, "fairly traceable" to the Statute.

The District Court concluded that, because other uncertainties stood in the way of the completion of an extended runway, the causation element was not satisfied. The District Court reasoned that because Tweed would have to obtain additional funding, secure approvals from various regulators, and obtain environmental and other permits, none of which was assured, there did "not appear to be a direct causal relationship between the statute and the plaintiff's alleged injury." *Tweed-New Haven*, 2017 WL 4400751, at *8, 2017 LEXIS 162356, at *22-23.

As an initial matter, the uncertainties seized upon by the District Court have no bearing on Tweed's fears of the Statute's enforcement, which is an independent basis for Article III standing. Further, we disagree with the District Court's analysis of the causation element of standing. A plaintiff is not required

11

to show that a statute is the sole or the but-for cause of an injury. An injury can be "fairly traceable" even when future contingencies of one kind or another might disrupt or derail a project. The fact that a project's ultimate completion may be uncertain because a plaintiff must undertake additional steps, such as obtaining funding, environmental permits, or additional carriers, does not defeat standing. Nearly every project of any complexity involves contingencies or uncertainties of some sort. The point of a standing inquiry is not to figure out whether a plaintiff will likely achieve a desired result. The point is simply to ensure that a plaintiff has a sufficient nexus to the challenged action in the form of a personal stake in the litigation so that the case or controversy requirements of Article III are met. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016).

The Supreme Court has held that there is standing where "the challenged action of the [government] stands as an absolute barrier" that will be removed "if [the plaintiff] secures the . . . relief it seeks." *Vill. of Arlington Heights v. Metro. Hous. Development Corp.*, 429 U.S. 252, 261 (1977). There, a developer sought to build a cluster of low- and moderate-income townhouses in the Village of Arlington Heights. *Id.* at 254. The developer eventually sued the Village for

12

denying its application for a zoning variance, alleging racial discrimination and violations of the Fair Housing Act of 1968. *Id.* The Village argued that there was no injury for standing purposes because contingencies stood in the way of final completion of the project. *Id.* at 261 & n.7.

The Supreme Court, in language fully applicable here, rejected the view that the existence of contingencies was a barrier to standing. *Id.* at 261. The Court held that standing was not defeated because the developer "would still have to secure financing, qualify for federal subsidies, and carry through with construction." *Id.* (footnote omitted). We are, the Court emphasized, "not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy." *Id.* at 261-62.

We have also held that, for standing purposes, it was enough that plaintiffs alleged "diligent efforts" to secure funding and had made progress on the project in question. *NAACP v. Town of Huntington,* 689 F.2d 391, 394 (2d. Cir. 1982). In *Town of Huntington,* a not-for-profit housing group sought to construct a large multi-family housing unit. The group sued the town, alleging that its zoning regulations violated federal law. *Id.* at 393. While the suit was pending,

the funds appropriated for the project lapsed and the town moved to dismiss the complaint on the ground that the lack of funding would render the requested relief (invalidation of the ordinance) meaningless. We nevertheless found standing because the group had shown diligent efforts to secure funding and had shown "some reasonable prospect for future financing" and obtaining governmental approvals if the statute was invalidated, which is all that is required. *Id.* at 394. Tweed comfortably meets this test. It has shown more than "diligent efforts" toward, and a reasonable prospect of, the project's completion.

Third, as to redressability, there is no question that a favorable decision will likely redress Tweed's fear of the Runway Statute's enforcement. *Cayuga Nation v. Tanner*, 824 F.3d 321, 332 (2d Cir. 2016) (stating that redressability requirement is met where the court could prevent enforcement of a preempted law). A favorable decision will also likely redress Tweed's current inability to move forward with the runway extension and will remove the absolute barrier the Statute imposes. *See W.R. Huff Asset Mgmt. Co.*, 549 F.3d at 106-107; *see also Lujan*, 504 U.S. at 560-61. Accordingly, we hold that Tweed has established Article III standing.

14

**II.**

Next, the State contends that Tweed cannot bring suit against Connecticut because it is a political subdivision of Connecticut. As support for this proposition, the State relies on *Williams v. Mayor of Baltimore*, 289 U.S. 36 (1933), and *City of Trenton v. New Jersey*, 262 U.S. 182 (1923). *Williams* involved a suit under the Equal Protection Clause and *Trenton* involved a suit under the Contract Clause and the Fourteenth Amendment. In both cases, the Supreme Court held that suits under those provisions were not permitted. *Williams*, 289 U.S. at 40; *City of Trenton*, 262 U.S. at 188.

The view that subdivisions were broadly prevented from suing a state was put to rest in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). There, the Supreme Court considered a challenge under the Fourteenth and Fifteenth Amendments to Alabama's gerrymandering of the boundaries of the City of Tuskegee. *Id*. at 340. The Court rejected Alabama's assertion that a state's power over its political subdivisions was unrestricted by the Constitution: "Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution." *Id.* at 344-45. The Court

emphasized that the "correct reading" of *Williams* and *City of Trenton* is "that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases." *Id.* at 344. Significantly, none of those cases involved the Supremacy Clause, which raises unique federalism concerns.

Hundreds of federal laws apply nationwide to states and their political subdivisions. They impose various responsibilities and prohibitions on states and political subdivisions that are intended by Congress to apply nationwide. If the Supremacy Clause means anything, it means that a state is not free to enforce within its boundaries laws preempted by federal law. Lawsuits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur.

In the years following *Gomillion*, the Supreme Court has repeatedly entertained suits against a state by a subdivision of the state, including cases under the Supremacy Clause. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 252-53 (2011) (considering suit by independent state agency against its state for violation of federal law alleged to conflict with state law); *Nixon v. Mo. Mun. League*, 541 U.S. 125, 130-31 (2004) (considering Supremacy Clause challenge by municipalities and utilities against state statute); *Lawrence Cty. v.*

*Lead-Deadwood Sch. Dist.*, 469 U.S. 256, 258 (1985) (considering Supremacy Clause challenge by county against state statute); *accord Bd. of Educ. v. Allen*, 392 U.S. 236 (1968); *see also Romer v. Evans*, 517 U.S. 620, 623-24 (1996) (state constitutional amendment preventing local anti-discrimination ordinances violated the Equal Protection Clause); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 487 (1982) (state statute prohibiting a local busing desegregation plan violated the Fourteenth Amendment).[7] In light of this authority, we hold that a subdivision may sue its state under the Supremacy Clause. In reaching this conclusion we join the Fifth and Tenth Circuits. *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979); *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998). *But see Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360 (9th Cir. 1998) (holding a political subdivision lacks standing to sue its own state under the Supremacy Clause).

---

[7] We have held that a political subdivision does not have standing to sue its state under the Fourteenth Amendment. *See Aguayo v. Richardson*, 473 F.2d 1090, 1100 (2d Cir. 1973); *City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973). Those cases provide no aid to the State as Tweed is not seeking to assert its own rights under the Fourteenth Amendment, which presents considerations different from those we consider here.

**III.**

Tweed next contends that the Runway Statute is preempted by the FAAct.[8]

We agree. The FAAct "was enacted to create a uniform and exclusive system of federal regulation in the field of air safety . . . . [It] was passed by Congress for the purpose of centralizing in a single authority . . . the power to frame rules for the safe and efficient use of the nation's airspace." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 224-25 (2d Cir. 2008) (internal quotation marks omitted). With these objectives in mind, we have held that the FAAct impliedly preempts the entire "field of air safety." *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210-11 (2d Cir. 2011). Accordingly, "[s]tate laws that conflict with the FAA[ct] or sufficiently interfere with federal regulation of air safety are . . . preempted." *Fawemimo v. Am. Airlines, Inc.*, 751 F. App'x 16, 19 (2d Cir. 2018) (summary order). Our court has been clear as can be that FAAct

---

[8] Tweed also contends that the Runway Statute is preempted by the Airline Deregulation Act and the Airport and Airway Improvement Act. Because we conclude that the Runway Statute is preempted by the FAAct, we make no determination concerning preemption under these other statutes.

preemption applies to airport runways. *Air Transp. Ass'n,* 520 F.3d at 224-25

(FAAct preemption "extends to grounded planes and airport runways").

Our next inquiry is whether the Runway Statute falls within the scope of that preemption. "The key question is thus at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted[.]" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992). We straightforwardly conclude that the Runway Statute falls well within the scope of the FAAct's preemption because of its direct impact on air safety.

The Airport has the 13th shortest runway out of the 348 airports where commercial service is provided. Furthermore, the State has conceded that "the length of the runway has a direct bearing on the weight load and passenger capacity that can be safely handled on any given flight." Joint App'x 55. Because of the Statute, "[w]eight penalties are imposed on [existing] aircraft [at the Airport] for safety reasons." *Id*. The Statute has limited the number of passengers that can safely occupy planes leaving the Airport by preventing planes from taking off at maximum capacity. For these safety reasons, carriers are forced to cut back on an ad-hoc basis the number of passengers that can safely be carried,

the amount of baggage they can bring with them, and the total weight of luggage that can be loaded.

Additionally, the Runway Statute has sharply limited the types of planes that can use the runway. Modern jet passenger planes of the types used across the country cannot safely use the Airport. This localized, state-created limitation is incompatible with the FAAct's objective of establishing "a 'uniform and exclusive system of federal regulation' in the field of air safety." *Air Transp. Ass'n*, 520 F.3d at 224 (quoting *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 639 (1973)). If every state were free to control the lengths of runways within its boundaries, this Congressional objective could never be achieved.

The inflexibility of the ban imposed by the Runway Statute also counsels in favor of preemption. The Runway Statute's restriction on runway development is absolute—it is a total barrier to improvements that could make Tweed safer and more modern. Courts in this Circuit have held that the FAAct preempts significantly less rigid statutes that merely place limitations rather than total bans on runway modification. For example, in *Tweed-New Haven Airport Authority v. Town of East Haven* ("*Tweed I*"), the court held that a state regulation that required

regulatory approval before the runway safety areas could be constructed was preempted. 582 F. Supp. 2d 261, 268-69 (D. Conn. 2008). Similarly, in *Town of Stratford v. City of Bridgeport,* the court held that a statute that required an airport to obtain approval of the town in which it is located before it can undertake a federally mandated runway safety project was preempted. No. 10-cv-394, 2010 WL 11566477, at *6, 2010 LEXIS 65975, at *21-23 (D. Conn. June 18, 2010). Those statutes merely required state or city approval for improvements to an airport's runway. Unlike those cases, the Runway Statute prohibits runway expansion entirely. The Statute's interference with the field of air safety is, therefore, even greater than was the case with other statutes courts have held to be preempted by the FAAct.

Finally, we have noted that FAAct preemption is less likely to apply "to small airports over which the FAA has limited direct oversight." *Goodspeed*, 634 F.3d at 211-12. Tweed is not such an airport. On the contrary, the FAA's involvement with Tweed and its runway project has been direct and significant. The Airport is federally regulated and exists within the Tweed-New Haven Airport Layout Plan ("ALP"), which is approved by the FAA. The FAA

maintains full control over any modification to the ALP, including runway length. The Airport is classified by the FAA as a primary commercial service airport and is required to hold an operating certificate under FAA regulation 14 C.F.R. Part 139. A Master Plan is required of all Part 139 airports, and Tweed's Master Plan, which includes extending the length of the runway up to 7,200 feet, was approved by the FAA as far back as 2002. This level of federal interest and involvement is further indication that the Runway Statute is preempted.

In response to all of this, the State maintains that implied preemption is not warranted because the Runway Statute "does not prevent Tweed from complying with any federally-mandated safety standards." Appellee's Br. at 56-57. But the State confuses different branches of implied preemption law: conflict preemption and field preemption. Conflict preemption exists when a state law "actually conflicts with federal law," *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), in other words, where "state law stands as an obstacle to the accomplishment" of Congress's intent, *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). This case involves field preemption, not conflict preemption. Field preemption exists where "Congress intended the Federal Government to occupy

22

[a field] exclusively." *Air Transp. Ass'n*, 520 F.3d at 220. And as we have seen, Congress intended the FAAct to occupy the entire field of air safety including runway length.

The State next asserts that the FAAct does not preempt the Runway Statute because here, unlike in *Tweed I*, no federal mandate requires that Tweed extend its runway. *See* Appellee's Br. at 58. This characterization misses the point. Preemption analysis does not turn on whether the airline safety activity is mandated by the federal government; the dispositive question is whether the Runway Statute intrudes into the field of air safety. We conclude that it does and does so directly. For these reasons, we hold that the Runway Statute is preempted by the FAAct.

## CONCLUSION

The judgment of the lower court is **REVERSED** and the case is **REMANDED** for entry of judgment in favor of Tweed.