20-2951

*Jones et al. v. Goodrich Pump & Engine Control Systems, Inc. et al.*

In the
United States Court of Appeals
for the Second Circuit

_____

August Term, 2021

No. 20-2951

BRENDA JONES, AS CO-ADMINISTRATOR OF THE ESTATE OF JOHN DAVID HORTMAN,
JILL HORTMAN MORRIS, AS CO-ADMINISTRATOR OF THE ESTATE OF JOHN DAVID
HORTMAN,

*Plaintiffs-Appellants*,

ADALIA LEE REDD, INDIVIDUALLY AND CO-ADMINISTRATOR FOR THE ESTATE OF
STEVEN BURTON REDD, DEZARAY REDD, INDIVIDUALLY, JAZLYN REDD,
INDIVIDUALLY AND CO-ADMINISTRATOR FOR THE ESTATE OF STEVEN BURTON REDD,
TRYSTYN REDD, INDIVIDUALLY,

*Consolidated-Plaintiffs-Appellants*,

v.

GOODRICH PUMP & ENGINE CONTROL SYSTEMS, INC., ROLLS-ROYCE CORP.,

*Consolidated-Defendants-Appellees*,

L-3 COMMUNICATIONS CORPORATION, L-3 COMMUNICATIONS HOLDINGS, INC.,

*Consolidated-Defendants*,

GOODRICH CORPORATION, ROLLS-ROYCE NORTH AMERICA, INC., MD HELICOPTERS, INC., L3 COMMUNICATIONS INTEGRATED SYSTEMS, LP, ALLISON ENGINE COMPANY, INC., BOEING CO.,

*Defendants*.

---

Appeal from the United States District Court
for the District of Connecticut
No. 12-cv-1297

(Argued February 23, 2022; Decided November 21, 2023)

Before:     LIVINGSTON, *Chief Judge*, KEARSE and LEE, *Circuit Judges*.

Plaintiffs-Appellants appeal from an order of the United States District Court for the District of Connecticut (Eginton, *J.*) granting summary judgment against them on the grounds that their state law tort claims are barred by implied field preemption flowing from the Federal Aviation Act. Plaintiffs-Appellants argue that the Federal Aviation Act's preempted field does not include military aircrafts like the one to which their suit pertains. Applying ordinary principles of statutory interpretation, we agree. We therefore **VACATE AND REMAND**.

TEJINDER SINGH, Goldstein & Russel, P.C., Bethesda, Maryland (Ronald L.M. Goldman, Timothy A. Loranger, Crawford Appleby, Baum Hedlund Aristei & Goldman, PC, Los Angeles, California, Arthur Alan Wolk, The Wolk Law Firm, Philadelphia, Pennsylvania, John J. Gagliano, Gagliano Law Offices, Philadelphia, Pennsylvania, *on the brief*), *for Plaintiffs-Appellants*.

JOHN W. CERRETA (James H. Rotondo, Andraya P. Brunau, Day Pitney LLP,

Hartford, Connecticut, Thomas R. Pantino, Fitzpatrick & Hunt, Pagano Aubert, LLP, New York, New York, *on the brief*), *for Defendant-Appellee Goodrich Pump & Engine Control Systems, Inc.*

J. DENNY SHUPE (Robert J. Williams, Schnader Harrison Segal & Lewis LLP, Philadelphia, Pennsylvania, Steven E. Arnold, SA Law, P.C., Boston, Massachusetts, *on the brief*), *for Defendant-Appellee Rolls-Royce Corporation.*

Jeffrey R. White, American Association for Justice, Washington, D.C.; Justin T. Green, Anthony Tarricone, Joseph P. Musacchio, Kreindler & Kreindler LLP, New York, NY, *for American Association for Justice, amicus curiae in support of Plaintiffs-Appellants.*

Allison M. Zieve, Adina H. Rosenbaum, Public Citizen Litigation Group, Washington D.C., *for Public Citizen, amicus curiae in support of Plaintiffs-Appellants.*

Jonathan M. Hoffman, MB Law Group LLP, Portland, OR, *for Product Liability Advisory Council, amicus curiae in support of Defendants-Appellees.*

3

Lauren L. Haertlein, General Aviation Manufacturers Association, Inc., Washington, D.C., *for General Aviation Manufacturers Association, Inc., and National Association of Manufacturers, amici curiae in support of Defendants-Appellees*.

Brian M. Boynton, Principal Deputy Assistant Attorney General, Mark B. Stern, Lindsey Powell, Ben Lewis, Attorneys, Appellate Staff Civil Division, Department of Justice, Washington, D.C., *for the United States, amicus curiae in support of neither party*.

EUNICE C. LEE, *Circuit Judge*:

After two United States Army pilots tragically perished in a helicopter crash, their surviving family members sued various companies responsible for the making of the helicopter. The family members alleged that manufacturing and/or defective operating instructions and warnings caused the pilots' deaths. The companies countered that the family members' asserted state law claims were barred by a number of preemption doctrines.

The district court granted summary judgment in favor of the companies, finding that there was implied field preemption under the Federal Aviation Act (the "FAAct" or "Act"). The district court held that the family members' claims

4

were preempted under this Court's case law stating that Congress intended for the FAAct "to occupy the entire field of aviation safety," *Jones v. Goodrich Corp.*, 422 F. Supp. 3d 518, 521, 525–26 (D. Conn. 2019) (Eginton, *J.*) (citing *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011)). Although the family members argued that the FAAct could not preempt their claims because the Act applies only to civil aircrafts—and the helicopter that crashed here was a military aircraft—the district court rejected that argument, reasoning that, even though the FAAct "exempt[s] government military aircrafts from [FAAct] standards," this "does not constrain the clear congressional intent to occupy the entire field of aviation safety." *Jones*, 422 F. Supp. 3d at 525.

We disagree. Field preemption is always a matter of congressional intent, and we think Congress's removal of military aircrafts from the FAAct's reach indicates that it did not wish to include them in the FAAct's preempted field. Rather, Congress intended for the Department of Defense ("DoD") to have autonomy over their own aircrafts. While it is possible that the family members' claims may be barred by the military contractor defense, another preemption doctrine, *see generally Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988)—this determination requires a fact-intensive analysis to be handled by the district court

5

in the first instance. Finally, aside from any issues of preemption by the military contractor defense, the family members offered sufficient evidence under Georgia law for their strict liability manufacturing defect claim to survive summary judgment.

Accordingly, we **VACATE** the judgment of the district court and **REMAND** for further proceedings.

## I. BACKGROUND

On August 8, 2011, United States Army Captain John David Hortman and Chief Warrant Officer Steven Redd were piloting a military helicopter in connection with a training exercise at Fort Benning, Georgia. The helicopter crashed, killing them both.

Approximately 36 seconds before the crash, the helicopter's Full Authority Digital Electronic Control ("FADEC"),[1] the engine module that controls the flow of fuel to the engine, detected an anomaly that caused it to disable its normal mode of automatic operation. Instead, the FADEC entered fixed mode, in which it

---

[1] While FADEC is the term consistently used for the system in question, the parties reference the full name as both Full Authority Digital Electronic Control and Full Authority Digital Engine Control.

provides the engine with fuel at the same rate it had at the moment it left automatic mode.

For a pilot, a FADEC entering fixed mode signals an emergency. In response, the pilot must switch the FADEC out of fixed mode into its manual mode, which requires properly timing when to make the switch, waiting for the FADEC to switch over, and then piloting the helicopter while using a lever mechanism to regulate the flow of fuel. Unfortunately, Captain Hortman and Chief Redd were unable to regain control of the helicopter in time.

Plaintiffs-Appellants ("Appellants"), surviving family members of Captain Hortman and Chief Redd, sued the engine manufacturers—Rolls-Royce Corporation ("Rolls-Royce") and Goodrich Pump & Engine Control Systems, Inc. ("Goodrich")—collectively, Consolidated Defendants-Appellees ("Appellees"), among other defendants not party to this appeal, because the FADEC at issue was developed by Goodrich in collaboration with Rolls-Royce.

Appellants allege that the fatal helicopter crash resulted from defects in the FADEC's design and manufacture. First, they contend that one of the FADEC's components, its potentiometer, failed in a manner indicating that it was defectively manufactured, and that, once the potentiometer failed, no pilots could

7

have recovered the helicopter to avert the crash at issue in this case. Second, Appellants argue that the engine's maintenance manual was defectively designed because it failed to identify the potentiometer as a part to be investigated when the FADEC enters fixed mode. Indeed, two weeks prior to the crash that killed Captain Hortman and Chief Redd, the same helicopter had a FADEC issue, but Army engineers did not check the potentiometer because they followed the manual's troubleshooting steps. As a result, the helicopter was put back into service.

Contesting Appellants' theories of liability, Rolls-Royce and Goodrich argued, in relevant part, that the helicopter engine in question—including its FADEC—was manufactured and designed to meet specifications the Army required in a contract. Among other things, the Army contract required Rolls-Royce to obtain a type certification from the Federal Aviation Administration (the "FAA") for the helicopter's engine. "[T]ype certification" is "[t]he first stage of the FAA compliance review" that a manufacturer must complete "before marketing" certain types of aircrafts and aircraft parts. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 805 (1984). The FAA is to "issue a type certificate" once it finds that the aircraft or aircraft part "is properly

designed and manufactured, performs properly, and meets the regulations and minimum standards prescribed under" other parts of the FAAct and its implementing regulations. 49 U.S.C. § 44704(a)(1); *see also* 14 C.F.R. § 21.21 (discussing type certification requirements). And, under the Army contract, the helicopter's engine maintenance manual also had to be provided to the FAA for certification.

After the parties completed summary judgment briefing, the district court *sua sponte* requested briefing on whether this Court's cases on FAAct implied field preemption applied to Appellants' claims. The district court subsequently held that Appellants' claims were preempted because "[t]he Second Circuit has found clear congressional intent to occupy the entire field of aviation safety." *Jones*, 422 F. Supp. at 521 (citing *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011)). The court reasoned that, because Goodrich and Rolls-Royce had obtained the "type certificate," this meant that the engine "met federal certification standards," and thus that using state tort "law rules for aircraft components would interfere with the uniform requirements established by the federal government." *Id.* at 523–24. In reaching its holding, the district court rejected Appellants' arguments that the FAAct does not apply to "the

9

military helicopter at issue in this case," because "[t]he decision to exempt government military aircraft from FAA standards in certain contexts does not constrain the clear congressional intent to occupy the entire field of aviation safety." *Id.* at 524–25.

The district court further held that Appellants' manufacturing defect claims failed on the merits. The court reasoned that Appellants failed to provide evidence that the potentiometer was defective at the time it was manufactured, and further that applicable state law relieved Goodrich and Rolls-Royce from liability because the potentiometer "was supplied by [a] third-party vendor." *Id.* at 525.

Appellants timely appealed.

After hearing oral argument, we subsequently called for the views of the FAA and the DoD on whether the FAAct's preemption of the field of aviation safety included the military helicopter at issue here. 2d Cir. 20-2951, ECF Nos. 199, 200. The United States filed a responsive amicus curiae brief on February 8, 2023. *Id.* at ECF No. 221. Appellants and Appellees filed responsive briefs on March 7, 2023. *Id.* at ECF Nos. 226, 227.

## II. STANDARD OF REVIEW

"We review a district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the party opposing summary judgment and drawing all reasonable inferences in [their] favor." *M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 35 (2d Cir. 2022) (internal quotation marks omitted). "Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* at 35–36 (quoting Fed. R. Civ. P. 56(a)). And "[w]e review *de novo* a district court's application of preemption principles." *Glover v. Bausch & Lomb Inc.*, 6 F.4th 229, 236 (2d Cir. 2021) (quoting *Goodspeed Airport*, 634 F.3d at 209 n.3).

## III. DISCUSSION

### A. FAAct Field Preemption

Previously, "we have held that the FAAct impliedly preempts the entire 'field of air safety.'" *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 74 (2d Cir. 2019) (quoting *Goodspeed Airport*, 634 F.3d at 210–212). "Accordingly, 'state laws that conflict with the FAAct or sufficiently interfere with federal regulation of air safety are preempted.'" *Id.* (alteration marks omitted) (quoting *Fawemimo v. Am. Airlines, Inc.*, 751 F. App'x 16, 19 (2d Cir. 2018) (summary order)).

11

Determining whether implied FAAct field preemption applies in any particular case thus requires a "twofold" inquiry:  First, a reviewing court must determine whether a challenged state law falls within the "field of air safety" as established by the FAAct, and second, it must determine whether "the state regulation sufficiently interferes with federal regulation [such] that it should be deemed pre-empted."  *Goodspeed Airport*, 634 F.3d at 211 (alteration marks omitted) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992)).  At bottom, this calls for an assessment of congressional intent.  *See Goodspeed*, 634 F.3d at 211–12 ("In occupying the field of air safety, Congress did not intend to preempt the operation of state statutes and regulations like the ones at issue here" that required a local airport to "obtain a permit before removing the trees in question" from its property.); *see also Tweed-New Haven Airport Auth.*, 930 F.3d at 74 (state statute regulating runway was preempted because "[i]f every state were free to control the lengths of runways within its boundaries, th[e] Congressional objective" of "a uniform and exclusive system of federal regulation in the field of air safety" "could never be achieved" (internal quotation marks omitted)).

A review of the FAAct shows that Congress did not intend for military aircrafts to fall within the FAAct's preempted "field of air safety."  The FAAct vests

12

the FAA with authority to "promote safe flight of *civil* aircraft." 49 U.S.C. § 44701(a) (emphasis added). The term "civil aircraft" is key, as Congress drew a distinction between "civil aircraft," 49 U.S.C. § 40102(a)(16), and what it deemed "public aircraft," § 40102(a)(41). Under the FAAct, a "civil aircraft" is defined as any "aircraft except a public aircraft." § 40102(a)(16). A "public aircraft," meanwhile, includes "[a]n aircraft owned or operated by the armed forces." § 40102(a)(41)(E). Thus, the FAAct explicitly removes aircrafts owned or operated by the armed forces from its purview. Further, in giving the FAA authority to "issue a type certificate," Congress provided that these certifications would be available for aircrafts or aircraft engines that "meet[] the regulations and minimum standards prescribed under section 44701(a) of this title," which again only speaks to handling the safety "of civil aircraft." *See* §§ 44704(a)(1); 44701(a). Accordingly, by repeatedly distinguishing between *civil* and *public* aircrafts as it did, and by only creating a system for regulating the former, it appears that Congress did not intend for the military helicopter at issue here to fall within the preempted field created by the FAAct.

Instead, the logical conclusion is that Congress meant for the DoD and the Army to have authority over their own aircrafts. For one thing, Congress provided

13

that "[s]ubject to the authority, direction, and control of the Secretary of Defense . . . the Secretary of the Army is responsible for . . . all affairs of the Department of the Army, including . . . [t]he construction, outfitting, and repair of military equipment." 10 U.S.C. § 7013(b)(11). For another, as the United States points out in its amicus brief, the DoD and the Army have robust regulations and policies for managing the safety of their aircrafts. DoD policy provides that "[a]ll aircraft and air systems owned, leased, operated, used, designed, or modified by DoD must have completed an airworthiness assessment," performed by a department airworthiness authority, so as to provide personnel "the appropriate level of safety of flight and risk management adapted to DoD-unique mission requirements." DoD Directive 5030.61, DoD Airworthiness Policy § 3(a), Enclosure 3 § 1(a) (May 24, 2013). Army regulations make explicit the DoD's authority, as they state that an Army airworthiness release, an Army-specific certification, is "[r]equired prior to the operation of a new aircraft system, subsystem, [or] component." Army Reg. 70-62 § 3-1(a)(2).

Faced with the FAAct's carveout for military aircrafts, Goodrich and Rolls-Royce argue that implied field preemption bars Appellants' claims anyway because "the Army required FAA certification of the [engine] and FADEC" as part

14

of an Army contract. Rolls-Royce Br. at 41; *see* Goodrich Br. at 43 ("[T]he . . . [e]ngine *did* receive a type certificate from the FAA as required by the Army in the parties' contract."). We disagree, as this argument disregards the key component of the inquiry, which is congressional intent. "Implied [field] preemption arises when . . . Congress intended the Federal Government to occupy a field exclusively." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (internal quotation and alteration marks omitted). As the United States rightly observes, "[t]he scope of the [FAAct]'s field-preemption is not extended by a contract provision that provides for FAA type certification as part of [a] military assessment," because "[t]he requirement results from the Army's decision," rather than from some Act of Congress. United States Amicus Br. at 15. In other words, the Army's ad-hoc contract negotiations cannot extend the scope of the field Congress intended to occupy with the FAAct. To be sure, there are times when "contract terms have preemptive force," but those situations result because "federal statutes" explicitly state that specific "contractual terms" are to have preemptive force. *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 98 (2017) (expounding on a statute providing that certain "contract terms have preemptive force only as they 'relate to the nature, provision, or extent of coverage or benefits

15

(including payments with respect to benefits),'" and citing similar statutes (quoting 5 U.S.C. § 8902(m)(1))).  Here, nothing in the FAAct suggests Congress meant for government contract negotiations to extend the field that the FAAct preempts.

Accordingly, FAAct implied field preemption does not apply in instances where a military aircraft is the subject of dispute.

## B.  Conflict Preemption and the Military Contractor Defense

Goodrich and Rolls-Royce also argue that we may affirm the district court via two other preemption doctrines:  (1) conflict preemption and/or (2) the military contractor defense.

"Conflict preemption exists when a state law actually conflicts with federal law, in other words, where state law stands as an obstacle to the accomplishment of Congress's intent."  *Tweed*, 930 F.3d at 75 (internal citation and quotation marks omitted).   But as with field preemption, conflict preemption only results if we "find that Congress intended to preempt state law."  *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).  We determine if this is the case by "applying standard tools of statutory construction" to assess whether "the challenged state law falls within the scope of Congress's intent to preempt."  *Id.* at 96–97.

16

We cannot find conflict preemption here for the reasons already explained with regard to field preemption—there is no indication that Congress meant for the FAAct to regulate military aircrafts. The FAA itself has come to this same conclusion, as it has announced that "[a]ircraft operated by the military are by statute public-use aircraft and are not subject to the civil regulatory requirements for certification." FAA, Advisory Circular No. 20-169, *Guidance for Certification of Military and Special Mission Modifications and Equipment for Commercial Derivative Aircraft (CDA)* 6 (Sept. 30, 2010).

By contrast, while the military contractor defense may be applicable to this case, whether and how it applies is a fact-specific question that we will leave for development in the district court on remand. *See Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 105 (2d Cir. 2022) ("[W]hile we may be *free* to affirm on any ground that finds support in the record, even if it was not the ground upon which the district court relied, we have made clear that we *prefer* not to speculate in the first instance as to issues not passed upon below." (internal quotation marks omitted)).

Under the military contractor defense, "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law . . . when (1) the United States approved reasonably precise specifications; (2) the equipment

17

conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment." *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 121–22 (2d Cir. 2021) (quoting *Boyle*, 487 U.S. at 512).

Appellants contend that the Army did not approve "reasonably precise specifications for the FADEC," Reply Br. at 27, which, if correct, would bar application of the military contractor defense, *see In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 91 (2d Cir. 2008) (explaining that the military contractor defense is available where *inter alia* "[t]he government . . . independently and meaningfully reviews the specifications such that the government remains the agent of decision" (internal quotation and alteration marks omitted)). To the contrary, Goodrich argues that the Army was "heavily involved in all phases of the FADEC's design and development," Goodrich Br. at 6, and that "[t]he Army was aware of the risks of its chosen configuration for the . . . FADEC," *id*. at 11. Notably, the government views the military contractor defense as providing the proper framework for assessing plaintiffs' claims but takes no position as to questions of fact that will permit the ultimate disposition of the claims. *See* United States Amicus Br. at 18, 20. As such, we leave questions as to these competing factual accounts for resolution in the district court in the first instance.

18

## C. Appellants' Manufacturing Defect Claims

Finally, we agree with Appellants that the district court erred in finding that Appellants' manufacturing defect claims failed for lack of evidence, even if not barred by FAAct implied field preemption.[2]  Applying Georgia law, the district court determined that, because Appellants relied only on "post-accident testing" of the potentiometer, they failed to adduce necessary evidence as to whether the potentiometer was defective "at the time of assembly, as required for a manufacturing defect claim."  *Jones*, 422 F. Supp. 3d at 525.  The court also believed that, because the potentiometer was supplied by a "third-party vendor," the Appellees could not be responsible for its manufacturing defects.  *Id.*  The court erred on both of these points.

The district court misapprehended Georgia law in discounting the post-accident testing.  "Because a product may be destroyed as a result of an incident, circumstantial evidence is particularly appropriate in product liability cases to show the manufacturing defect."  *Rose v. Figgie Int'l, Inc.*, 229 Ga. App. 848, 851 (1997) (discussing cases where circumstantial evidence was ruled admissible to

---

[2] We leave it to the district court to decide on remand whether the military contractor defense is applicable to the manufacturing defect claim.

show defects); *see Folsom v. Sears, Roebuck & Co.*, 174 Ga. App. 46, 46 (1985) (finding a triable issue with regard to strict liability based on post-accident testing). Here, Appellants' post-accident testing suggests that, had the potentiometer been properly manufactured, it would not have failed the way it did, especially not so soon into its service life. Appellants' expert testified that the potentiometer was the most likely cause of the FADEC error that led to the crash. Further, both Goodrich and Rolls-Royce presented materials to the Army in which they identified potentiometers as a common cause of multiple prior helicopter engine failures. Under a proper reading of Georgia law, this would be sufficient for Appellants to proceed to a jury on a claim of strict products liability.

Additionally, although the district court is correct that Georgia law does not provide for "strict liability" for "entities that had no real role in the creation of products," *Buchan v. Lawrence Metal Prod., Inc.*, 270 Ga. App. 517, 520–21 (2004), it erred in determining that this was the case here. The district court found that Appellees could not be liable because they themselves did not manufacture the FADEC's allegedly defective potentiometer, but merely assembled it into the FADEC. S*ee Jones*, 422 F. Supp. 3d at 525. However, Georgia law holds that "an entity which assembles component parts and sells them as a single product under

20

its trade name is a 'manufacturer'" for products liability purposes. *Tyler v. PepsiCo, Inc.*, 198 Ga. App. 223, 226 (1990) (quoting *Pierce v. Liberty Furniture Co.*, 141 Ga. App. 175, 178 (1977), *superseded on other grounds by statute*, GA. CODE ANN. § 51-1-11.1. (1987)); *accord Williams v. Pac. Cycle, Inc.*, 661 F. App'x 716, 718 (11th Cir. 2016) (summary order) ("Georgia courts have made clear that" strict liability manufacturing defect claims are available against "'actual manufacturers—those entities that have an active role in the production, design, or assembly of products and placing them in the stream of commerce.'" (quoting *Alltrade, Inc. v. McDonald*, 213 Ga. App. 758, 760 (1994))); *Pfeil v. Mike's Golf Carts, LLC*, No. 5:13–CV–434 (CAR), 2015 WL 5342398, at *6 (M.D. Ga. Sept. 14, 2015) (denying summary judgment where there was "evidence [the company] took component parts manufactured by other entities . . . and assembled them to create" the allegedly defective product). Appellants adduced evidence that Goodrich manufactured the FADEC and that Rolls-Royce assembled the engine.

Moreover, in invoking the military contractor defense, Goodrich and Rolls-Royce attest that they themselves "had an active role in the production" and "design" of the FADEC so as to qualify them as manufacturers. *See Buchan*, 270

21

Ga. App. at 521. Accordingly, Appellees do not have a third-party vendor defense available against a strict liability manufacturing defect claim.

We refrain from resolving whether Appellants' negligence theory of manufacturing defect may proceed. While "evidence" of "an inherent defect" does not necessarily "demonstrate that the defect was the result of any negligence," *Owens v. Gen. Motors Corp.*, 272 Ga. App. 842, 848 (2005), here, no party has called to our attention any evidence in the record that would substantiate or defeat Appellants' negligence charge. Given that the parties did not meaningfully brief Georgia negligence law on appeal, we will leave it to the district court to resolve whether this or any other theory of liability—save for strict liability for the manufacturing defect in the potentiometer—may proceed to trial. *See Jusino*, 54 F.4th at 105.

## IV. CONCLUSION

The FAAct's preemption of the field of civilian aircraft safety does not extend to the military aircraft at issue here. And Appellants have adduced sufficient evidence to proceed to trial at least on their strict liability theory of manufacturing defect, assuming Appellees are not entitled to summary judgment on their military contractor defense. Accordingly, we **VACATE and REMAND**

for the district court to determine the applicability of the military contractor defense and for further analysis consistent with this opinion.