22-1711-cv
*Givaudan v. Conagen*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2022

(Argued:  June 5, 2023    Decided:  February 13, 2025)

Docket No. 22-1711-cv

GIVAUDAN SA,

*Plaintiff-Appellant,*

PHYTO TECH CORP., DBA BLUE CALIFORNIA,

*Plaintiff,*

*v.*

CONAGEN INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:      CHIN and MENASHI, *Circuit Judges*, and KOMITEE, *District Judge.*[*]

---

[*] Judge Eric R. Komitee of the United States District Court for the Eastern District of New York, sitting by designation.

Appeal from a decision and order of the United States District Court for the Southern District of New York (Koeltl, *J.*), following a bench trial. The district court held that Conagen, Inc. was not liable to Givaudan SA for breach of contract, promissory estoppel, or unjust enrichment, and dismissed the case. Givaudan appealed this ruling only as to their breach of contract claim.

AFFIRMED.

Judge Menashi dissents in a separate opinion.

———————————————

> Jonathan M. Bernstein, Goldberg Segalla LLP, New York, NY, *for Plaintiff-Appellant*.
>
> Martin J. Black (Katherine A. Helm, *on the brief*), Dechert LLP, New York, NY, *for Defendant-Appellee*.

———————————————

KOMITEE, *District Judge:*

Plaintiff-Appellant Givaudan, S.A. ("Givaudan"), based in Switzerland, is a multinational manufacturer and seller of flavors and fragrances. Defendant-Appellee Conagen Inc. ("Conagen"), based in Massachusetts, is in the "synthetic biology" business. Sometime prior to 2014, a Conagen affiliate began supplying a sweetener to Givaudan.

2

From that point, the relationship expanded. On September 15, 2016, the two companies executed a term sheet (the "Term Sheet") that is at the center of this case. The Term Sheet described the broad parameters of certain transactions being contemplated by the companies and their affiliates. "Key Term 1" of the document described a stock purchase in which Givaudan would pay $10 million for a 5% equity stake in Conagen. Other key terms contemplated additional agreements, including one by which Givaudan would gain exclusive rights to Conagen's intellectual property.

After both parties signed the Term Sheet, Givaudan wired $10 million as payment for the stock purchase contemplated in Key Term 1, and Conagen later delivered the corresponding shares. But negotiations regarding other key terms, including the exclusivity arrangement, ultimately broke down, and no further agreements were reached.

Givaudan then sued Conagen, asserting claims for breach of contract, promissory estoppel, and unjust enrichment, and seeking return of its $10 million. Following a bench trial, Judge Koeltl found that Conagen was not liable for any of Givaudan's claims and dismissed the case. Givaudan appealed the dismissal of its breach of contract claim (but not its other causes of action).

3

For the reasons that follow, we affirm the judgment of the district court.

## BACKGROUND

### I.    *Factual Background*[1]

Prior to 2014, Conagen's affiliate Phyto Tech Corp., doing business as Blue California ("Blue Cal"), began supplying a sweetening product to Givaudan.  To facilitate this arrangement, Givaudan and Blue Cal entered a joint venture called BGN Tech LLC.  Following that, Givaudan and Conagen began to discuss the possibility of Givaudan investing in Conagen itself.  The first such investment materialized in July 2015, when Givaudan paid $10 million for a 5% equity interest in Conagen pursuant to a comprehensive, written stock purchase agreement.

#### A.    *The Term Sheet is Drafted and Executed*

Following this investment, the two companies discussed the possibility that Givaudan would make additional investments in Conagen and /

---

[1]    The following facts are drawn from the district court's findings, or are otherwise undisputed.  *See, e.g.*, *SEC v. Rashid*, 96 F.4th 233, 236 n.1 (2d Cir. 2024).  We accept the district court's findings unless clearly erroneous.  *E.g.*, *Republic of Turkey v. Christie's Inc.*, 62 F.4th 64, 67 (2d Cir. 2023).

4

or its affiliates. In early September 2016, following Givaudan's fiftieth anniversary party (which Conagen's President attended), in-house counsel for Conagen's Blue Cal affiliate circulated a package of documents drafted by outside counsel. App'x at 541, 738. Among them was a draft Memorandum of Understanding setting forth several "Key Terms," as well as a draft stock purchase agreement, a draft "exclusivity" agreement relating to Conagen's intellectual property, a draft right-of-first-offer (or "ROFO") agreement,[2] and several other draft documents.

The draft Memorandum of Understanding described the parameters of a second equity investment by Givaudan in Conagen. On September 12, 2016, Juerg Witmer, the chairman of Givaudan's board of directors, emailed Conagen's president Steven Chen to confirm a meeting in San Francisco the following week. *Id.* at 604. Dr. Witmer attached a revision of the draft Memorandum of Understanding, which he re-named the Term Sheet. *Id.* at 605.

Notably, Dr. Witmer had divided the language of the first term — which in the Memorandum of Understanding subsumed the stock purchase and

---

[2]     The exclusivity agreement and ROFO constituted two separate drafts: the exclusivity agreement covered certain categories of Conagen's intellectual property, App'x at 843, while the ROFO related to the manufacture of specified products, App'x at 885.

the exclusivity agreement — into three terms: Key Term 1 of the Term Sheet, which discussed an additional $10 million investment for another 5% of Conagen's stock and certain organizational changes; and Key Terms 2 and 3, which related to exclusivity and licensing agreements, respectively, for Conagen's "specified IP." *Id.* Key Term 1 read:

> Givaudan will invest an additional $10 M for an additional 5% of Conagen, based upon a $200 M evaluation from the 2015 Givaudan/Conagen deal. Conagen will adjust its management structure to include legal/finance, CSO and office and regulator managers, and securing confidentiality and non-compete agreements from its CSO Oliver Yu and CEO Steven Chen.[3]

*Id.*

Key Term 2 laid out what intellectual property the exclusivity arrangement would cover and under what conditions the exclusivity would terminate. It read:

> Conagen will provide Givaudan with exclusivity to Conagen's specified IP (including sweeteners) either in concept or mature for F&F [flavors and fragrances]. Exclusivity will convert to non-exclusivity should Givaudan fail to use commercially reasonable efforts to commercially exploit mature IP, or develop concept IP, within 12 months from it being licensed to Givaudan.

*Id.*

---

[3] This term may contain typos or mistranslations: "evaluation" may have been intended as "valuation," for example, and "regulator" as "regulatory." CSO is a reference to the Chief Science Officer position.

Key Term 3 read: "The parties will agree on licensing terms for the commercial exploitation of the specified IP by Givaudan." *Id.* Key Terms 4 through 6 are of lesser relevance in this dispute.[4]

Dr. Witmer also added a preamble to the new draft Term Sheet. The preamble stated that the "parties currently envision that they will negotiate in good faith and enter into one or more agreements which will contain terms and conditions similar to those detailed below and other terms and conditions to be negotiated by the parties." The preamble contemplated that the Term Sheet would "be succeeded by the terms and conditions of the executed agreements, if any." *Id.*

Dr. Witmer concluded his cover email with a statement about the stock purchase itself: "In order to show our commitment I am perfectly happy to sign the term sheet on Conagen as per the attachment together with you when we meet next Thursday in San Francisco *and to effect the additional equity payment for Conagen immediately*." *Id.* at 604 (emphasis added). On Thursday, September

---

[4]     Key Term 4 contemplated "good faith" discussions concerning "future investments" in Conagen's affiliates, and Key Term 5 discussed confidentiality. Key Term 6 dealt with governing law and forum selection.

15, 2016, the parties proceeded in precisely this way. At the meeting in San Francisco, Witmer, Chen, and another Givaudan executive signed the Term Sheet, which was substantially the same as the version Dr. Witmer had circulated earlier in the week, with minor formatting tweaks.

Within days of this meeting, Givaudan wired to Conagen the $10 million referenced in Key Term 1.[5]

B.    *Developments Subsequent to the Term Sheet*

Several days later on September 26, 2016, Givaudan's in-house counsel Roberto Garavagno emailed Blue Cal's counsel Holly You. Garavagno attached "a redline of the SPA [stock purchase agreement] and the schedules for [You's] review." *Id.* at 984. On October 7, 2016, You replied with a "mark up" of the stock purchase agreement. *Id.*[6]

Sometime in October, Dr. Christian Thoen — Givaudan's Head of Science and Technology — presented a slide deck to Givaudan's board of directors. The presentation described the second stock purchase as having been

---

[5]    Givaudan's head of science and technology testified that the wire issued "within a few days" of the San Francisco meeting, App'x at 155-56, which is consistent with Judge Koeltl's characterization of the wire having followed "immediately." *Givaudan SA v. Conagen, Inc.*, No. 18-CV-3588, 2022 WL 2804983, at *4 (E.D.N.Y. July 18, 2022) (Findings of Fact ¶ 26).

[6]    Neither Robert Garavagno's nor Holly You's mark-up appears in the appellate record.

concluded.  It stated: "This informs the Board on an increase in equity stake in Conagen from 5 to 10% . . . :  Givaudan's Board of Directors is informed that another 5% stake for $10,000,000 *has been* acquired."  *Id.* at 591 (emphasis added).

That same month, on October 12, You circulated a revised set of deal documents.  This set contained updated versions of the same documents as the September bundle, with the exception that no stock purchase agreement was included.  No significant changes to the draft exclusivity agreement were made between the September and October 2016 drafts.  *See Givaudan SA v. Conagen, Inc.*, No. 18-CV-3588, 2022 WL 2804983, at *4 (E.D.N.Y. July 18, 2022) (Findings of Fact ¶ 30); App'x at 519.  Both the September and October draft exclusivity agreements contained a provision, which appears to have been introduced by Blue Cal's outside counsel, regarding "Specified IP."  App'x at 847, 925.  This provision gave Givaudan the *opportunity* to enter into a "Proof of Concepts R&D Agreement" with Conagen to develop certain intellectual property within a set period after being notified about the creation of such intellectual property.

The agreement divided Specified IP into two categories: mature IP was titled "Fully Developed Specified IP," whereas early-stage IP was titled "Proof of Concept Specified IP."  The agreement provided, in pertinent part, that:

9

> If, within the Agreement Period, [Givaudan] in writing notifies [Conagen] its intent [sic] not to conclude or the Parties are unable to agree on the terms and conditions of the Proof of Concepts R&D Agreement, then no Specified IP License Agreement will be concluded and [Conagen] shall have the right perform [sic] further research alone or jointly with any other Person(s).

*Id.* at 847. Under this arrangement, exclusivity over the "Specified IP" — i.e., both early-stage and mature intellectual property — would be unavailable to Givaudan if Givaudan elected not to fund the research and development of Conagen's early-stage IP. This marked a shift (of sorts) from the twelve-month exclusivity contemplated in the Term Sheet's Key Term 2.

Despite the fact that Givaudan had already wired the $10 million equity payment, both versions of the draft recited that the exclusivity agreement would be made "[i]n order to induce [Conagen] to enter into the Second SPA and to induce [Givaudan] to invest funds in the Company pursuant to the Second SPA." *Id.* at 921.

### C. *The Relationship Between the Companies Deteriorates*

In the end, the parties were unable to agree on the exclusivity arrangement.

On October 28, 2016, Givaudan's attorney advised his Conagen counterpart that Givaudan did not accept Conagen's proposed changes to the

10

exclusivity agreement. He wrote that "Givaudan cannot be obliged to develop Proof of Concept technologies instead of Conagen or lose exclusivity. . . . Doing otherwise has the potential to void the exclusivity of any meaning." *Id.* at 982. Referring to an attached draft of the exclusivity agreement, he indicated that Givaudan had reinstated exclusivity language from an earlier draft.[7] The attached redline also omitted Conagen's new language about how and when exclusivity would terminate. *Id.* at 992.

In early November, Givaudan informed Conagen that it did not intend to pursue the investment in the two Conagen affiliates contemplated by Key Term 4 of the Term Sheet. Garavagno explained this development, as well as the breakdown in negotiations regarding exclusivity, in an email to two other Givaudan executives on November 8, 2016. *Id.* at 623. He wrote that Conagen "would not consider anymore granting us exclusivity on its technology as a counterpart to our investment, but possibly a right of first refusal (option we discarded previously as insufficient . . .)." *Id.*

Shortly thereafter, Conagen's president, Givaudan's top science officer, and another Givaudan executive — Messrs. Chen, Thoen, and Graber,

---

[7]     The earlier draft that Garavagno referenced is not in the appellate record.

11

respectively — discussed the status of negotiations by phone.  Following this call, Conagen's President Chen emailed several Givaudan executives on December 1, 2016.  He included a summary of what was discussed.

In his third bullet point, Chen addressed the equity investment that was the subject of the Term Sheet's Key Term 1.  Using the present tense, he wrote: "3)  Givaudan *is* a 10% equity investor of Conagen."  *Id.* at 634 (emphasis added).  Graber responded on Givaudan's behalf a week later, writing "in CAPS" to highlight his responses.  In response to Chen's third bullet, Graber concurred with the characterization of Givaudan as a 10% investor.  He wrote: "CONFIRMED AND THIS IS [] VERY IMPORTANT FOR OUR GO FORWARD RELATIONSHIP.  WE NEED TO DISCUSS RIGHT OF FIRST REFUSAL VERSUS EXCLUSIVITY.  THIS NEEDS TO BE ALIGNED WITH CHRIS [THOEN] AND LEGAL."  *Id.* at 634.

Following this email exchange, the companies continued to negotiate the agreements contemplated in the Term Sheet — including documentation for the equity purchase in Key Term 1.  In a February 13, 2017, email, Conagen's counsel wrote to her Givaudan counterpart, saying that she was "following up on the documentation for the second 5% investment into

12

Conagen." *Id.* at 636. She referred to the stock purchase agreement and two employment contracts, stating that to her "understanding," "these agreements were not far from being final." *Id.* And she referred again to the exclusivity issue, stating her expectation that Givaudan would have "the right of first offer to license Conagen's IP in the field of flavor[s] and fragrances." *Id.* This appears to be a reference to the September 2016 change to the exclusivity agreement, discussed above.[8]

On May 10, 2017, Conagen transmitted stock certificates reflecting an additional 5% stake in the company to Givaudan via Federal Express. *Id.* at 638. Givaudan received the certificates the following day. *Id.* at 528. Upon receipt, Garavagno emailed Holly You at Conagen, purportedly reserving "the right to refuse this second capital increase" and referring to the $10 million payment for the first time as a mere "advance." *Id.* at 637. This was the first time that Givaudan, or anyone associated with it, suggested that this wire transfer was anything other than a payment.

Throughout the remainder of May and June, no additional steps

---

[8] The parties appear to describe this provision alternatively as a right of first refusal and right of first offer.

were taken to further negotiations between the companies. *See Givaudan*, 2022 WL 2804983, at *5 (Findings of Fact ¶¶ 38-39); App'x at 530. Finally, on June 26, 2017, Garavagno sent a letter breaking off negotiations and demanding the return of *both* $10 million investments. App'x at 640.

## II. *Proceedings Below*

Givaudan filed suit in April 2018. After Givaudan amended its complaint, Conagen moved to dismiss. Judge Koeltl granted this motion in part, dismissing Givaudan's claim for "money had and received," but declined to dismiss the remaining claims. Following discovery, Givaudan and Conagen both moved for summary judgment. Judge Koeltl denied the summary judgment motions in their entirety, concluding that genuine issues of material fact existed.

The parties proceeded to a bench trial in June 2022 in this case and a companion case, *Phyto Tech Corp. v. Givaudan SA*, No. 18-CV-6172 2022, WL 2905515, at *1 (S.D.N.Y. July 22, 2022). Throughout these proceedings, Givaudan sought return of its 2016 payment of $10 million as "reliance" damages but expressly disclaimed "expectation" damages. After reviewing the evidence, Judge Koeltl issued Findings of Fact and Conclusions of Law in an order dated July 18, 2022. He held that Conagen was not liable for breach of contract,

14

promissory estoppel, or unjust enrichment, and thus awarded Givaudan no relief.

Givaudan timely appealed one part of the district court's order of dismissal, contending that Judge Koeltl erred in holding that Conagen was not liable for breach of contract.

*STANDARD OF REVIEW AND APPLICABLE LAW*

On appeal from a bench trial, this Court reviews the district court's findings of fact for clear error and reviews conclusions of law and mixed questions *de novo*. *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 367 (2d Cir. 2008).[9] "Under the clear error standard, we may not reverse a finding even though convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently." *Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*, 945 F.3d 53 (2d Cir. 2019) (quoting *Mobile Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*, 190 F.3d 64, 67 (2d Cir. 1999)). The clear error standard applies not only to factual findings based on witness credibility, but also those predicated on the documentary evidence — such as the district court's observations concerning the

---

[9]     Unless otherwise noted, when quoting judicial decisions this opinion accepts all alterations and omits all citations, footnotes, and internal quotation marks.

15

various versions of the Term Sheet and proposed deal documents, among other materials. *Id.* at 63-64.

The dispute is governed by Delaware law. Under Key Term 6 of the Term Sheet, the "law and jurisdiction clauses agreed between the parties in the Limited Liability Company Agreement of BGN Tech" govern. App'x at 607. Because the BGN Tech agreement, in turn, incorporates Delaware law, the parties agreed below that Delaware law governs this dispute. *See Givaudan*, 2022 WL 2804983, at *4 (Findings of Fact ¶ 24).

## *DISCUSSION*

Delaware contract law classifies "preliminary" agreements, such as the Term Sheet, into two categories. We therefore begin the discussion in Section I., *ante*, by identifying the Term Sheet's place in that dichotomy. Following that, we delineate three bases for our affirmance of the district court's holding: first, Givaudan failed to prove damages, a necessary element of its breach of contract claim (Op., Section II., *ante*); second, Givaudan and Conagen agreed to *and performed* the stock purchase after the execution of the Term Sheet (Op., Section III, *ante*); and third, the stock purchase agreement was intended to be severable from, rather than dependent on, the ill-fated exclusivity

16

arrangement for Conagen's intellectual property (Op., Section IV, *ante*).

I. *The Term Sheet was a Binding, But Preliminary, Agreement that Established a Duty to Negotiate in Good Faith*

The district court held that the executed Term Sheet "constitute[d] a contract" — an express obligation to negotiate in good faith. *Givaudan*, 2022 WL 2804983, at *6 (Conclusions of Law ¶ 2) ("The fact that some of the terms required further negotiation does not negate the binding nature of the agreement."). The parties agree with this conclusion on appeal, as do we — the Term Sheet was a binding, but preliminary, agreement that established an enforceable duty to negotiate in good faith under Delaware law.

Delaware recognizes two types of preliminary agreements, in contrast to more fully developed contracts. *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 349 (Del. 2013) (hereinafter "*SIGA I*"). The first of these — a so-called "Type I" agreement — is "a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *Id.* at 349 n.82 (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)). A "Type II" agreement, on the other hand, includes agreement on certain major terms but leaves others open for

negotiation.  *Id.* at 349.  Type II agreements are, in effect, agreements to agree. They do "not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework."  *Id.*[10]

The Term Sheet in this case falls squarely into Type II.  While it includes certain terms that leave little, if anything, to future negotiation — such as Key Term 1 — other terms are more general.  Key Terms 2 through 4 call for future negotiations regarding the exclusivity of Givaudan's access to Conagen IP, the amount of licensing fees that Givaudan would pay, and potential future equity investments in Conagen affiliates.  The Term Sheet's preamble is agnostic on how many of these negotiations will succeed: it contemplates that the parties "will negotiate in good faith and enter into *one or more agreements*" on the listed subjects.  App'x at 607 (emphasis added).  And the preamble allows for the possibility that future negotiations will yield *no* agreements, stating that the "Term Sheet will be succeeded by the terms and conditions of the executed agreements, *if any*."  *Id*. (emphasis added).

---

[10]    As the citation to *Adjustrite*, above, indicates, the Delaware Supreme Court followed Second Circuit precedent in recognizing these two types of agreement.  *See SIGA I* at 349.

18

Consequently, the parties did not bind themselves to the precise terms laid out in the Term Sheet. However, under *SIGA I*, the obligation "to negotiate the open issues in good faith . . . within the agreed framework" is fully enforceable. 67 A.3d at 349. And the requirement of "good faith" obligated the parties not to renegotiate fundamental points established by the Term Sheet. In *SIGA I*, the Delaware Supreme Court held that a party breached the obligation to negotiate in good faith when it "disregarded" the terms in a term sheet; proposed "drastically different" terms that were "significantly more favorable" to itself; and was motivated to do so by "seller's remorse." *Id.* at 346-47.[11]

## II. *Givaudan Failed to Prove Damages, an Essential Element of a Delaware Contract Claim*

A breach of the obligation to negotiate in good faith may entitle the opposing party to damages, so long as that party proves it suffered damages. Givaudan argues that Conagen acted in bad faith by renegotiating the exclusivity

---

[11]     Delaware courts have applied *SIGA I*'s holding to find binding obligations to negotiate in good faith in term sheets. *See Bos. Consulting Grp., Inc. v. GameStop Corp.*, No. CV 22-363, 2023 WL 2683629, at *6-*9 (D. Del. Mar. 29, 2023) (holding, under Delaware law, that plaintiff plausibly alleged a breach of a Type II agreement to negotiate in good faith); *Greentech Consultancy Co. v. Hilco IP Servs., LLC*, No. CV-N20C-07-052, 2022 WL 1499828, at *1 (Del. Super. Ct. May 11, 2022) (term sheet obligated parties to negotiate "in good faith in an effort to reach final agreement within the scope that had been settled in the preliminary agreement"); *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 755-56 (Del. 2022) (holding that contemplated settlement agreement was a Type II agreement, and remanding to determine whether duty to negotiate in good faith was breached).

19

term in the Term Sheet in a fundamental way: proposing a more limited right to Conagen's intellectual property, which would lapse if Givaudan did not enter the R&D agreement with Conagen, in lieu of the Term Sheet's more robust twelve-month exclusivity period. We need not reach the issue of bad faith, however, because the district court correctly determined that Givaudan "failed to prove any damages." *Givaudan*, 2022 WL 2804983, at *7 (Conclusions of Law ¶ 10). This is dispositive on this appeal.

Damages are an essential element of a contract claim in Delaware. "[T]o state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). The failure to prove damages precludes a finding of liability for breach.[12] To establish the damages element, "a plaintiff must show both the existence of

---

[12]     Delaware courts routinely dismiss breach-of-contract claims for failure to allege or prove damages. *See, e.g.*, *Exit Strategy, LLC v. Festival Retail Fund BH, L.P.*, No. 2017-0017, 2023 WL 4571932, at *17 n.163 (Del. Ch. July 17, 2023) (entering judgment post-trial for defendants in breach of contract action, in part because plaintiffs failed to prove damages); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 883 (Del. Ch. 2009) (dismissing breach of contract claim "[b]ecause plaintiff has failed to properly allege the essential element of damages"); *Erisman v. Zaitsev*, No. 20-CV-903, 2021 WL 6134034, at *11 (Del. Ch. Dec. 29, 2021) (dismissing breach of contract claim for failing to allege resulting damages, "an essential element" of such a claim).

damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *Fox v. CDX Holdings, Inc.*, No. CV-8031, 2015 WL 4571398, at *35 (Del. Ch. July 28, 2015) (quoting *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, No. CV-7471, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013)).

Two types of damages are generally available to remedy the breach of a Delaware contract: "reliance" damages and "expectation" damages. *See SIGA I* at 351. Expectation damages comprise the amount by which the prevailing party would have profited absent the opposing party's breach. *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).[13] They are available only when the plaintiff demonstrates that the parties "would have reached an agreement but for the defendant's bad faith negotiations." *SIGA I* at 351. If such a finding is not made, only reliance damages may be awarded. *Titan*, 58 A.3d at 986. Reliance damages are "measured by [a party's] actually-incurred costs and expenses." *Id.*

Here, the district court held that Givaudan "expressly disclaimed

---

[13] This outcome was obtained in *SIGA* itself: In a later opinion, the Delaware Supreme Court upheld an award of $113 million in expectation damages based on a finding of bad faith. *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108 (Del. 2015), *as corrected* (Dec. 28, 2015) ("*SIGA II*").

21

expectation damages." *Givaudan*, 2022 WL 2804983, at *7 (Conclusions of Law ¶ 11). Givaudan does not contest that holding on appeal. Pl.-Appellant Br. at 52.[14] And as to reliance damages — the "costs and expenses" that Givaudan incurred as a result of Conagen's alleged breach — the district court was clear: "Givaudan has made no showing that it has incurred any costs or expenses." *Givaudan*, 2022 WL 2804983, at *7 (Conclusions of Law ¶ 12). We see no error in this conclusion, let alone clear error.

Quoting *SIGA I*'s definition of reliance damages, Givaudan pegs its "actually-incurred costs and expenses" at $10 million: the amount that it spent on the second tranche of Conagen shares, allegedly "in reliance on Conagen's promise to negotiate toward an IP exclusivity term consistent with Key Term Two." Pl.-Appellant Br. at 52. But Givaudan's outlay — $10 million in cash for stock worth $10 million — does not neatly fit into the category of reliance damages, as that term has been defined and applied in Delaware.[15]

---

[14]     This was no small concession, as Delaware law dictates that expectation damages are the standard remedy in a breach of contract case. *E.g.*, *Duncan*, 775 A.2d at 1022; *see also Reserves Dev., LLC v. Crystal Props., LLC*, 986 A.2d 362, 367 (Del. 2009) ("In a breach of contract action, we determine plaintiff's damages as if the parties had fully performed the contract.").

[15]     As discussed in greater depth below at Section IV, Key Term 1 was severable from the other provisions in the Term Sheet. Thus, Givaudan cannot argue that its additional $10 million investment was contingent on the negotiation or consummation of an exclusivity agreement.

The district court recognized as much, holding that "Givaudan has failed to show that it has incurred any damages from paying $10 million for a 5% interest in Conagen that it continues to hold." *Givaudan*, 2022 WL 2804983, at \*7 (Conclusions of Law ¶ 12). This holding dovetails with hornbook law on reliance damages:

> Reliance damages are designed to compensate the plaintiff for any reasonably foreseeable costs incurred or expenditures made in reliance on the promise that has now been broken. An award of reliance damages returns the plaintiff to its precontractual position by *putting a dollar value on the detriment the plaintiff incurred in reliance* on the now-broken promise and reimbursing expenditures the plaintiff made in performing or preparing to perform its part of the contract.

24 Samuel Williston & Richard A. Lord, Williston on Contracts § 64:4 (4th ed. 2023) (emphasis added). Here, as the district court held, Givaudan "made no showing that it ha[d] incurred any costs or expenses." *Givaudan*, 2022 WL 2804983, at \*7 (Conclusions of Law ¶ 12). Said differently, *per* Williston's language: Givaudan suffered no monetary detriment in reliance on Conagen's promises. It received $10 million in stock for $10 million in cash.

This is consistent with Delaware cases on reliance damages. Defendants in such cases have been required to reimburse, for example: due diligence expenses, legal expenses, travel expenses, rent payments, and

23

accounting fees related to the formation of an allegedly fraudulent business, *Paron Cap. Mgmt., LLC v. Crombie*, No. CIV.A. 6380, 2012 WL 2045857, at *8 (Del. Ch. May 22, 2012), *aff'd*, 62 A.3d 1223 (Del. 2013); and the deposit on an anticipated real estate sale, *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, No. CV 2020-0310, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

What Givaudan appears to contemplate is rescission. "Rescission requires that all parties to the transaction be restored to the *status quo ante*, *i.e.* to the position they occupied before the challenged transaction." *Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000). But this is a different remedy from the "out-of-pocket recovery" afforded by reliance damages.[16] *Id.* And it is a

---

16    To start, rescission is generally (though not always) an equitable remedy in Delaware, while damages are a legal remedy. *See Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 61 (Del. 2022) ("While rescission at law refers to the judicial declaration that a contract is invalid and a judicial award of money or property, equitable rescission offers a platform to provide additional equitable relief, such as cancellation of a valid instrument."). Highlighting the distinction, the Delaware Court of Chancery — a court of equity — "has declined to accept jurisdiction over matters involving a claim for rescission when plaintiff is in reality seeking only damages." *E.I. Du Pont De Nemours & Co. v. HEM Rsch., Inc.*, No. CIV. A. 10747, 1989 WL 122053, at *4 (Del. Ch. Oct. 13, 1989); *see also Fisher v. Valone, Inc.*, No. CIV.A.5874, 1980 WL 267624 (Del. Ch. Jan. 22, 1980)).

And further, rescission is generally awarded as a remedy for fraud or misrepresentation claims, not garden-variety breach of contract. *See CoVenture-Burt Credit Opportunities GP v. Coleman*, No. N22C-07-197, 2023 WL 7179488, *8 (Del. Super. Ct. Nov. 1, 2023) ("[A] claim for rescission or rescissory damages separates a fraudulent inducement claim from breach of contract damages."); *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982) ("Common grounds for rescission of a contract for the sale of real property include fraud, misrepresentation and mistake."); *Novipax Holdings LLC v. Sealed Air Corp.*, No. CV-N17C-03-1682, 2017

24

different remedy than what Givaudan has sought. Givaudan has been clear — both here and in the district court — that it is "seek[ing] return of the $10 million . . . as reliance damages." Pl.-Appellant Br. at 52.

The district court therefore properly found that Givaudan failed to establish all elements of its breach of contract claim, warranting dismissal. *Givaudan*, 2022 WL 2804983, at *7-8 (Conclusions of Law ¶¶ 10-13).

### III. *The Parties Consummated the Agreement Contemplated by Key Term 1, Separate and Apart From the Term Sheet*

Givaudan and Conagen reached two binding contracts during the events in dispute. First, they executed the Term Sheet — a preliminary, but nevertheless binding, agreement to agree on the substance spelled out in the Key Terms. Second, they actually reached agreement on *and performed* the equity purchase contemplated in Key Term 1. The district court correctly recognized as much, holding that the cash-for-equity transaction contemplated by Key Term 1 "was performed." *Givaudan*, 2022 WL 2804983, at *6 (Conclusions of Law ¶ 3).

---

WL 5713307, at *14 (Del. Super. Ct. Nov. 28, 2017) ("[Plaintiff] prays for rescission of the transaction or [rescissory] damages, which is a remedy for fraud."); *Universal Enter. Grp. v. Duncan Petroleum Corp.*, No. 4948, 2014 WL 1760023, *3 (Del. Ch. Apr. 29, 2014) (finding misrepresentations that did not constitute fraud "insufficient to support extra-contractual remedies like rescission"). Indeed, two of the rescission cases that the dissent cites involved fraud, *see Alejandro & Reinholz v. Hornung*, No. 12442, 1992 WL 200608, at *3 (Del. Ch. Aug. 12, 1992 , and misrepresentation, *see Norton*, 443 A.2d at 4. Dissenting Op., 7.

This performance occurred when "Givaudan voluntarily paid $10 million upon execution of the Term Sheet, and Conagen reciprocated by delivering stock certificates evidencing an additional 5% equity interest in Conagen." *Id.*

Under Delaware law, binding contracts can be made in writing, agreed to orally, *or implied by the parties' conduct*. *Cap. Mgmt. Co. v. Brown*, 813 A.2d 1094, 1098 (Del. 2002). Here, for the reasons that follow, the exchange of money for stock constituted an implied-in-fact contract.

"[A]n implied contract is one inferred from the conduct of the parties, though not expressed in words. The parties' intent and mutual assent to an implied-in-fact contract is proved through conduct rather than words." *Id.* Express contracts and implied-in-fact contracts are "legal equivalents – the first being arrived at by language and the second by actions that demonstrate a meeting of the minds." *Phillips v. Wilks, Lukoff & Bracegirdle, LLC*, No. 671,2013, 2014 WL 4930693, at *3 (Del. Oct. 1, 2014), *as corrected* (Oct. 7, 2014); *see also* 1 Williston on Contracts § 3:2 (4th ed. 2023) ("A binding mutual understanding or so-called 'meeting of the minds' . . . may be implied from the parties' conduct and the surrounding circumstances.").

Under Delaware law, "a valid contract" — in whatever form —

"exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). The first element is partly dependent on the second, as "all essential or material terms must be agreed upon before a court can find that the parties intended to be bound by it." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018).

Each of these elements is met with respect to the equity purchase here. The parties' intent was manifested through their conduct — delivering cash in exchange for stock. *See, e.g.*, *Eaton v. Eaton*, No. CIV.A. 286-S, 2005 WL 3529110, at *6 (Del. Ch. Dec. 19, 2005) ("[A]n offer may be accepted, unless the offeror provides otherwise, by performance of the act requested."). As to definite terms, a purchase contract may require no more than the identification of the property to be sold and the price to be paid for it. *E.g.*, *Osborn*, 991 A.2d at 1153 (finding a valid sales contract based on a specified price for a given property). In the context of a stock sale, the material terms are generally the identity of the

issuer, the amount of stock to be sold, and the price to be paid.[17]

Moreover, the parties' exchange of cash for equity constitutes a classic example of legal consideration on both sides of the deal. *See* Del. Code Ann. tit. 6, § 8-104(a)(1) (West) ("A person acquires a security or an interest therein, under this Article, if . . . the person is a purchaser to whom a security is delivered."); *cf. QC Holdings, Inc. v. Allconnect, Inc.*, No. CV 2017-0715, 2018 WL 4091721, at *9 (Del. Ch. Aug. 28, 2018) (finding that an entity acquires a security when stock certificates are purchased by and delivered to that entity). Once the contract was fully performed, Givaudan's power to revoke or supplant its offer ended. *Montray Realty Co. v. Arthurs*, 105 A. 183, 186 (Del. 1918) ("It is fundamental law that an offer may be revoked at any time *before* acceptance." (emphasis added)).

Delaware courts have repeatedly found implied contracts arising from similar courses of dealing. For example, in *Phillips v. Wilks*, the Delaware Supreme Court found an implied-in-fact contract between a business and a law

---

[17] Givaudan does not raise a statute of frauds defense and could not successfully do so. While the Delaware Statute of Frauds requires a written contract for certain sales over $500, purchases of securities are expressly carved out. Del. Code Ann. tit. 6, § 8-113 (West) ("A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making.").

firm where the business signed an engagement letter, the law firm represented them in a litigation, and the business "silently accepted [the firm's] services without raising any objection to the professional relationship." No. 671, 2013, 2014 WL 4930693, at *4 (Del. Oct. 1, 2014, corrected Oct. 7, 2017). Similarly, in *Ridley v. Bayhealth Medical Center, Inc.*, the Delaware Superior Court held that the plaintiff plausibly alleged the existence of an implied-in-fact contract with a healthcare provider when she ordered medical records and paid for them, and the healthcare provider sent the records. No. N17C-04-306, 2018 WL 1567609, at *7–8 (Del. Super. Ct. Mar. 20, 2018).[18] Therefore, neither Givaudan's attempt to reserve "the right to refuse this second capital increase," App'x at 637, — made *after* Conagen had already delivered the shares — nor the later demand for return of the $10 million, App'x at 640-41, could effectively undo the agreement.

This conclusion is only buttressed by the parties' conduct leading up to the purchase, including the negotiation and execution of the Term Sheet. That conduct evidences both the definite terms of the stock purchase as well as the parties' intent to be bound by it. These prior dealings are relevant because, in

---

[18]    As noted above, the Delaware Statute of Frauds requires a signed record for the sale of goods for the price of $500 or more to be enforceable, Del. Code Ann. tit. 6, § 2-201 (West), thus limiting the case law for implied contracts in the sale of goods. The same is not true for sales of services or securities. *Supra* at 29 n.19.

determining "whether a contract was formed, the court must examine the parties' objective manifestation of assent, not their subjective understanding." *Trexler v. Billingsley*, 166 A.3d 101, 103 (Del. 2017) (unpublished table decision). To do so, "the court reviews the evidence that the parties communicated to each other" until finalization of the contract. *Eagle Force Holdings*, 187 A.3d at 1229. In this effort, "court[s] may consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement." *Id.* at 1230.

Here, Givaudan's communications regarding the purchase evince the intent to be bound by the stock purchase as an independent agreement. Givaudan's chairman, Dr. Witmer, wrote his counterparties at Conagen and Blue Cal that he was "perfectly happy to sign a term sheet . . . *and* to effect the additional equity payment for Conagen immediately," which is precisely what he did days later. App'x at 604 (emphasis added).

Finally, the fact that the parties continued to exchange drafts of the stock purchase agreement following the performance of this implied-in-fact contract does not render the contract invalid. "Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so

30

operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof."  Restatement (Second) of Conts. § 27 (1981).

The Delaware Supreme Court has held that:

> Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed.

*Universal Prod. Co. v. Emerson,* 179 A. 387, 394 (Del. 1935).  This tracks Williston's proclamation that "where it was understood that the contract should be formally drawn up, and put in writing, the transaction is nevertheless complete and binding, absent a positive agreement that it should not be binding until so reduced to writing and formally executed."  1 Williston on Contracts § 4:11 (4th ed. 2023).[19]

In *Universal Products*, the court affirmed the validity of a preliminary contract based on letters and telegrams, despite the parties' stated (but unfulfilled) intention to create a formal written contract.  179 A. at 394-96.

---

[19]     *See also id*. ("It has been suggested that when parties act under a preliminary oral agreement or receive benefits from it, they are bound even though an ultimate writing was not prepared as contemplated and even though, but for such acts, they would not have been held to have contracted.").

Likewise, in *Loppert v. Windsor Tech, Inc.*, the Chancery Court noted the *Universal Products* rule, and concluded that the parties had entered a binding contract despite the lack of a signed writing. 865 A.2d 1282 (Del. Ch. 2004). It held that "the fact that the parties manifest an intention to prepare and adopt a written memorial will not prevent contract formation if the evidence reveals manifestations of assent that are in themselves sufficient to conclude a contract." *Id.* at 1288.

Here, the parties reached no "positive agreement" to be bound to the equity purchase *only* via a signed writing. The Term Sheet reflects no such agreement, and Givaudan has surfaced no other evidence of such a meeting of the minds.[20]

For those reasons, we concur with the district court's conclusion that

_____

[20] The closest the Term Sheet comes to this is the statement that it will be "succeeded by the terms and conditions of the *executed* agreements, if any." App'x at 607 (emphasis added). But that language is most reasonably read to indicate the parties' "understanding that the contract should be formally drawn up and put in writing," which *Universal Products* and its progeny indicate is not enough. *See Universal Prod. Co.*, 179 A. at 394. Simply put, it would place too much weight on the word "executed" to call that the "positive agreement" required — especially in the context of a negotiation between two sophisticated parties who would know how to express that positive agreement clearly. *See id.*

the equity purchase contemplated by Key Term 1 "was performed."[21]

### IV. Key Term 1 Was Severable From the Term Sheet's Other Terms

Givaudan argues that the stock sale and the exclusive license were interdependent under the Term Sheet. It asserts that the $10 million paid to Conagen was "in return for receiving the exclusive right to obtain defendant's intellectual property." Pl.-Appellant Br. at 1. Key Term 1 does not itself support this contention, given that it calls for the payment of money "for an additional 5% of Conagen." App'x at 607. Ten million dollars is the same price, moreover, that Givaudan had paid for the first 5% investment it made in Conagen, which included no exclusivity arrangement. Neither of those terms, nor any other provision *in the Term Sheet*, says anything about the stock purchase being conditioned on the successful entry into the exclusivity arrangement contemplated in Key Term 2.

---

21    The dissent reads the district court to have "concluded that the Term Sheet created a binding contract for the sale of stock" in itself, but we do not read the opinion below that way. The district court's Conclusion of Law No.2 says only that the "Term Sheet constitutes a contract." *Givaudan*, 2022 WL 2804983, at *6. That same passage goes on to describe the binding "contractual obligation to negotiate in good faith" under Delaware law. *Id*. The dissent also cites Conclusion of Law No. 16 for its reading, but that passage does not describe Key Term 1 as a binding contract for the sale of stock, either. There, the district court stated that "the Term Sheet, coupled with Dr. Witmer's agreement to transfer immediately" the payment for stock, constituted a binding agreement. *Id.* at *8. This passage is fairly read to refer to the implied-in-fact agreement we discuss below, especially when read in combination with the district court's observation that "Key Term 1 describes a cash for equity *transaction*" — not agreement — "that was performed." *Id.* at *6 (emphasis added).

33

Under Delaware law, "[w]hether a contract is divisible or entire is a question of intent which must be determined from the terms and subject matter of the contract, together with any pertinent explanatory circumstances." *Equitable Tr. Co. v. Delaware Tr. Co.*, 54 A.2d 733, 738 (Del. Ch. 1947); *see also Tracey v. Franklin*, 61 A.2d 780, 785 (Del. Ch. 1948), *aff'd*, 67 A.2d 65 (Del.1949). The "essential question" in this determination is:

> 'Did the parties give a single assent to the whole transaction, or did they assent separately to several things?' If there be a single assent to a whole transaction involving several things or several kinds of property, a contract is always entire. If, however, there be a separate assent to each of the several things involved, it is always divisible.

*Orenstein v. Kahn*, 119 A. 444, 446 (Del. 1922).

The Term Sheet is best understood to have called for separate assent to its various key terms, rendering Key Term 1, in particular, severable from the remaining terms. This severability is (again) evident in the language of the Term Sheet itself, as well as the parties' course of dealing leading up to and following its execution.

**A.**    *The Plain Language of the Term Sheet Favors Severability*

Evidence of the parties' intent with respect to severability must be "gathered from their acts, under all the facts and circumstances of the particular

34

transaction," *Johnson Forge Co. v. Leonard*, 51 A. 305, 307 (Del. 1902); *accord Palumbo v. Ewing*, 540 F. Supp. 388, 391 (D. Del. 1982); *St. Regis Sales Corp. v. Wilson Cabinet Co.*, 90 A.2d 488, 491 (Del. Super. Ct. 1952), as well as, of course, "the terms and subject matter of the contract" itself, *Abercrombie v. Davies*, 123 A.2d 893, 901 (Del. Ch. 1956). Here, the plain language of the Term Sheet militates in favor of severability.

"[W]here the amount to be paid upon each particular kind of property is specifically named in the contract, a strong current of authorities maintains the divisibility of the . . . contract." *Smiley v. New Castle Mut. Ins. Co.*, No. C.A. 90C-151, 1992 WL 91162, at *2 (Del. Super. Ct. Apr. 20, 1992) (quoting *Thurber v. Royal Ins. Co.*, 40 A. 1111, 1113 (Del. Super. Ct. 1894)). Here, the amount to be paid for the 5% equity interest in Conagen was specified in Key Term 1, setting that term apart as an independently executable exchange. This distinguishes Key Term 1 from (for example) Key Term 3, which left the dollar amount of the licensing fees for Conagen's intellectual property to be determined in later negotiations. App'x at 607; *see also Givaudan*, 2022 WL 2804983, at *6 (Conclusions of Law ¶ 5) ("The definitiveness of Key Term 1 is to be contrasted with the specifics of Key Terms 2 and 3 which were left to be negotiated in good

35

faith.").

Given Term 1's contemplated exchange of assets with defined values, the parties' obligations thereunder constituted "agreed equivalents" under Delaware law. The doctrine of agreed equivalents is deployed in analyzing whether part of a contract is independent — and thus properly severable — from others. *See Brandin v. Gottlieb*, No. CIV. A. 14819, 2000 WL 1005954, at *21 n.53 (Del. Ch. July 13, 2000) (explaining why performance or breach of a discrete part of a contract may in some cases affect a counterparty's obligation with respect to that part alone). It is a "mitigating doctrine" that asks us to consider whether this case falls within

> that important class of cases in which it is proper to regard corresponding parts of performances of each party as agreed equivalents. [The doctrine's] effect is to give a party who has performed one of these parts the right to its agreed equivalent as if the parties had made a separate contract with regard to that pair of corresponding parts.

Restatement (Second) of Conts. § 240 cmt. a.[22] Here, the parties agreed to value the 5% equity stake in Conagen at $10 million. Thus, these assets are properly regarded as agreed equivalents.

---

[22] Delaware courts regularly follow the Restatement (Second). *See, e.g., Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 68 (Del. 2022); *James v. Nat'l Fin., LLC*, 132 A.3d 799, 814 (Del. Ch. 2016); *Brandin*, 2000 WL 1005954, at *21 n.53 (quoting the Restatement on "agreed equivalents").

In addition to the language of Key Term 1, the preamble and structure of the Term Sheet further support severability. Delaware courts look to a contract's recitals to divine the parties' intent. *Abercrombie*, 123 A.2d at 901-02 (quoting the recital to the relevant agreement in assessing whether severability would disrupt its stated purpose). Here, the Term Sheet's preamble expressly anticipated that the parties would "negotiate in good faith and enter into *one* or more agreements which will contain terms and conditions similar to those detailed below." App'x at 607 (emphasis added).

Dr. Witmer's reference to "one or more" future agreements supports Conagen's position. If the Term Sheet was one integrated whole, the parties could not enter into only "one" binding agreement thereafter — the entry into a stock purchase agreement, for example, would be conditioned on their entry into an exclusivity agreement, and (presumably) vice-versa. Nor did the parties appear to be contemplating an integrated agreement containing both a stock-purchase and an exclusivity component, as evidenced by the multiple, separate agreement drafts exchanged just before the Term Sheet was executed. As it happened, the parties did enter into only one subsequent agreement: the one in which they exchanged cash for stock.

37

The paragraph structure of the Term Sheet also supports severance: as the district court observed, the division of the stock purchase and the exclusivity arrangement into separate Key Terms — a division effectuated *by Givaudan* — suggests their independence more than their dependence. *Givaudan*, 2022 WL 2804983, at *6 (Conclusions of Law ¶ 5).

Finally — and also as noted by the district court — the Term Sheet contained no provision regarding the return of funds or stock certificates in the event that other contemplated negotiations were unsuccessful. *Id.* at *6 (Conclusions of Law ¶ 4); *see also id.* at *4 (Findings of Fact ¶ 27) ("While Givaudan now claims that the payment of the $10 million is a reversible 'advance,' there is no basis to infer that was the mutual intent of the parties at the time the Term Sheet was executed."). The district court's factual findings on the question of intent were eminently well-supported by the record. As the court noted, it would have been straightforward to describe the stock purchase as conditioned on the successful negotiation of exclusivity. *See Givaudan*, 2022 WL 2804983, at *4 (Findings of Fact ¶ 27); *id.* at *6 (Conclusions of Law ¶ 4). Or, the Term Sheet could have described the $10 million payment as an "advance," as Givaudan seeks to characterize it now. But no such language appears in either

38

Key Term.[23]

**B.**   *The Parties' Course of Dealing Favors Severability*

To the extent the language and structure of the Term Sheet leave room for ambiguity, the parties' course of dealing also supports treating the stock purchase and the exclusive license as severable.  Indeed, it is difficult to imagine a clearer "separate assent" to the stock purchase than the one both parties — but primarily Givaudan —evinced.  Givaudan's CEO wrote, prior to initiating the $10 million wire, that in order to show Givaudan's "commitment" he was "perfectly happy to sign a term sheet . . . next Thursday in San Francisco and to effect the additional equity payment for Conagen immediately."  App'x at 604; *see Givaudan*, 2022 WL 2804983, at *3 (Findings of Fact ¶ 19).

This email is not reconcilable with Givaudan's later-articulated position that the wire was merely an "advance."  App'x at 637.  Dr. Witmer indicated his intention to "effect" a "payment."  App'x at 604.  Payment means "[p]erformance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation."  *Payment*, Black's

---

[23]   As the drafter of the Term Sheet, Givaudan is hard-pressed to rewrite it now.  Generally, when a contract "is ambiguous, the principle of *contra preferentem* dictates that the contract must be construed against the drafter" — here, Givaudan's own Chairman.  *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 630 (Del. 2003).

Law Dictionary (11th ed. 2019). In contrast, the term "advance" is more typically used — in common parlance and in case law — to refer to the early payment of future wages or royalties. An advance may be issued to a book seller, for example — *see Septembertide Pub. v. Stein & Day, Inc.*, 884 F.2d 675, 677 (2d Cir. 1989) (describing obligation to pay an advance against future royalties from book sales). Or to a music producer. *See Harris v. Wu-Tang Prods., Inc.*, No. 00-CR-28, 2006 WL 1677127, at *1 (S.D.N.Y. June 16, 2006) (describing sale of interests in music compositions in return for "designated advances and royalties"). But it is far from apparent why one company buying stock from another company would contemplate an advance.

Also important is Dr. Witmer's use of the word "immediately." App'x at 604. This usage plainly reflected Givaudan's intent to effectuate the stock purchase without waiting to learn whether or how the other contemplated agreements would materialize. At the risk of stating the obvious, it would have been impossible to "effect" such a transaction "immediately" if its viability depended on the successful completion of other, more complex agreements.

The drafting history is also relevant. As the trial court noted, Dr. Witmer affirmatively divided the stock-for-cash transaction from the other

40

provisions in the Term Sheet. *See Givaudan*, 2022 WL 2804983, at *2-3 (Findings of Fact ¶¶ 18-19). This was a change from the Draft Memorandum of Understanding that preceded the Term Sheet. App'x at 740; *Givaudan*, 2022 WL 2804983, at *2-3 (Findings of Fact ¶¶ 18-19). This, too, evinces an intent to allow the equity purchase to stand on its own. *See Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 895-96 (Del. 2015), *as revised* (Mar. 27, 2015) (assessing the "intent of the parties as evidenced by the drafting history" of the relevant agreement); *LPPAS Representative, LLC v. ATH Holding Co.*, No. CV 2020-0241, 2022 WL 94610, at *5 (Del. Ch. Jan. 10, 2022) ("[T]he contemporaneous drafting history is the most reliable extrinsic evidence of the parties' intent.").

Three days after Dr. Witmer's email, the parties proceeded precisely as he had anticipated. They finalized and executed the Term Sheet. App'x at 607-08. Givaudan then transferred the $10 million to "effect the additional equity payment." App'x at 604, 155-56, 353. Although drafts of a stock purchase agreement were exchanged which made an exclusivity agreement a closing condition to the stock purchase, App'x at 757-58, such agreements were never

41

finalized or signed.[24]

Moreover, internal and external communications following the $10 million payment reveal that *Givaudan itself* considered the stock purchase to have closed even absent the execution of the exclusivity agreement.[25]  The October 2016 board presentation informed Givaudan's board of directors of "an increase in equity stake in Conagen from 5 to 10% for an additional $10,000,000," reiterating that "another 5% stake for $10,000,000 has been acquired."  App'x at 591.  The past tense of this statement, too, is irreconcilable with the notion that the $10 million was an "advance" or that the stock purchase was subject to a future condition.  Givaudan's Mauricio Graber echoed this sentiment in his email to Chen, in which he wrote about the need to discuss the "right of first refusal versus exclusivity," but "CONFIRMED" that "Givaudan *is* a 10% equity investor

---

[24]    The draft Stock Purchase Agreement circulated by You on September 9, 2016, included as a closing condition an "exclusivity agreement, substantially in the form attached hereto as Exhibit C." App'x at 758.  Notably, the attached Exclusivity Agreement draft includes language granting only a right of first refusal in Conagen's intellectual property.  App'x at 847.  This is the same arrangement that Givaudan ultimately rejected as insufficient.

[25]    While these communications occurred during the course of the stock purchase, they did post-date the execution of the Term Sheet.  Nevertheless, Delaware courts have found that conduct post-dating a term sheet's execution can inform the intent of the parties with respect to the terms therein.  *See Pharmathene, Inc. v. Siga Techs., Inc.*, No. CIV.A. 2627-VCP, 2008 WL 151855, at *9 (Del. Ch. Jan. 16, 2008) (analyzing the parties' conduct following execution of a term sheet to evaluate its binding nature) (superseded on other grounds).

of Conagen."  App'x at 634 (emphasis added).

To be sure, the September and October 2016 drafts of the exclusivity agreement stated that Givaudan would enter the agreement "[i]n order to induce [Conagen] to enter into the Second SPA and to induce [Givaudan] to invest funds in the Company pursuant to the Second SPA."  App'x at 921.  But this statement is difficult to square with, among other things, the near-contemporaneous presentation to Givaudan's board of directors that described the additional investment in Conagen as already completed.  App'x at 591.  And even if we were to understand the September and October 2016 drafts as evidence of Givaudan's *subjective* view that the stock purchase agreement had not been consummated, it remains the case that contract formation depends on "the parties' *objective* manifestation of assent, not their subjective understanding." *Trexler*, 166 A.3d at 103 (emphasis added).

Taken together, then, this course of communication and conduct belies Givaudan's assertion that the equity purchase and exclusivity agreement were interdependent.

*CONCLUSION*

For the foregoing reasons, we AFFIRM the judgment of the district court.

MENASHI, *Circuit Judge*, dissenting:

After Givaudan and Conagen agreed in a term sheet to "negotiate in good faith and enter into one or more agreements" for a potential sale of stock and grant of exclusivity rights to certain intellectual property, Givaudan transferred $10 million to Conagen as a gesture of good faith and of confidence that an agreement would be reached. App'x 607. But the negotiations broke down before the parties reached a deal. Instead of returning the $10 million, Conagen sent stock certificates to Givaudan and claimed that "Key Term 1" of the Term Sheet had effectuated a sale of stock. Givaudan expressed "surprise[]" upon receiving the stock certificates because it expected the shares to be issued only once the parties had executed "an acceptable [stock purchase agreement] and certain agreements relating to IP." *Id.* at 637. Givaudan then sued Conagen for breach of contract, promissory estoppel, and unjust enrichment.

The district court erred in deciding that the Term Sheet was a contract of sale and that, assuming it was such a contract, its terms were severable. And the district court compounded the error by rejecting Givaudan's equitable claim of unjust enrichment based on its erroneous conclusion that the Term Sheet was a contract of sale. In today's opinion, the majority agrees that the Term Sheet was not a contract of sale, but it nevertheless affirms the judgment on three alternative grounds: (1) the parties consummated an implied-in-fact agreement; (2) the key terms in the Term Sheet were severable; and (3) Givaudan failed to prove damages.

I disagree that these grounds save the judgment. The first two grounds lack support in the record, and the third ground does not address Givaudan's unjust enrichment claim. I would vacate the judgment and remand for the district court to determine in the first

instance whether the parties reached an implied-in-fact agreement and to reconsider Givaudan's unjust enrichment claim that was dismissed based on the erroneous conclusion that the Term Sheet was an enforceable contract of sale. Because the majority instead embarks on new fact-finding on appeal, I dissent.

## I

The district court concluded that the Term Sheet created a binding contract for the sale of stock. According to the district court, "[t]he Term Sheet constitutes a contract" of which "Key Term 1 describes a cash for equity stock transaction that was performed." *Givaudan SA v. Conagen Inc.*, No. 18-CV-3588, 2022 WL 2804983, at *6 (S.D.N.Y. July 18, 2022). The district court reiterated that "Key Term 1 governs the exchange of cash for equity" and created "an enforceable contract governing that promise." *Id.* at *8.

That conclusion was wrong. The Term Sheet unambiguously described a framework for negotiating in good faith toward an agreement or agreements. The Term Sheet provided that the "parties *currently envision that they will negotiate in good faith and enter into one or more agreements*" that will contain terms similar to six "Key Terms." App'x 607 (emphasis added). The only obligation the Term Sheet created was to negotiate in good faith toward another agreement or agreements. And the Term Sheet expressly contemplated that such other agreements may not be reached. *See id.* ("This Term Sheet will be succeeded by the terms and conditions of the executed agreements, *if any*.") (emphasis added). That language applied to each key term, including the proposed sale of stock.

Even if the Term Sheet were ambiguous, the parties' course of dealing would confirm this conclusion. Both parties circulated drafts of the proposed stock purchase agreement after the execution of the

2

Term Sheet—and those drafts show that the parties did not understand the Term Sheet to have effectuated a contract of sale.[1] The parties would not have circulated drafts of a stock purchase agreement if the executed Term Sheet was itself a stock purchase agreement.

The majority recognizes that the Term Sheet was not a binding contract for the sale of stock. The court correctly explains that "the parties did not bind themselves to the precise terms laid out in the Term Sheet." *Ante* at 19. Instead, the Term Sheet was "a preliminary, but nevertheless binding, *agreement to agree* on the substance spelled out in the Key Terms." *Id.* at 25 (emphasis added); *see also id.* at 17 (describing the Term Sheet as creating "an express obligation to negotiate in good faith"); *id.* (stating that the Term Sheet "established an enforceable duty to negotiate in good faith"). The subsequent agreement toward which the parties negotiated would have effectuated the sale of stock. Because that agreement was never reached, the parties never entered into a contract of sale.

## II

Although the majority acknowledges that the Term Sheet was not a contract for the sale of stock, it nevertheless affirms the judgment on an alternative ground: the parties consummated an implied-in-fact agreement when, during the ongoing negotiations,

---

[1] Conagen sent an initial draft on September 9, 2016, App'x 738; Givaudan responded with revisions on September 26, 2016, *id.* at 984; Conagen sent additional revisions on October 7, 2016, *id.*; and Conagen followed up on February 13, 2017, *id.* at 636. Months after the dispute over exclusivity, Conagen's lawyer still understood the stock purchase agreement not to have been finalized. *See id.* ("I am following up on documentation for the second 5% investment in Conagen. ... [It is] my understanding that these agreements were not far from being final.").

"they actually reached agreement on *and performed* the equity purchase contemplated in Key Term 1." *Id.* at 25. For two reasons, this alternative ground cannot rescue the judgment.

## A

First, contrary to the majority's suggestion, the district court did not determine that the parties reached an implied-in-fact agreement. The district court did not need to resolve that question because it concluded that the Term Sheet itself was an express contract for the sale of stock. [2] The majority emphasizes the conclusion of the district court that the transaction Key Term 1 described "was performed." *Id.* (quoting *Givaudan*, 2022 WL 2804983, at *6). But the district court said that the transaction was performed because Key Term 1 was "an enforceable contract" that "governs the exchange of cash for equity." *Givaudan*, 2022 WL 2804983, at *8. It rejected Givaudan's promissory estoppel claim because "Givaudan cannot use a claim of promissory estoppel to vary the *written agreement that the parties executed*," again emphasizing its conclusion that the parties executed a written rather than an implied-in-fact agreement. *Id.* (emphasis added). The district court further claimed that "Givaudan could have sued under the Term Sheet for damages," relying yet again on its determination that the Term Sheet was a contract to purchase stock. *Id.* at *9. At no point did the district court

---

[2] *See Good v. Moyer*, No. N12C-03-033, 2012 WL 4857367, at *5 (Del. Super. Ct. Oct. 10, 2012) ("A contractual obligation cannot be implied where an express obligation exists. A court will only consider recovery under an implied contract if there is no express contract which governs the parties' rights and obligations. An implied contractual obligation cannot flow from matters expressly addressed in a written contract.") (internal quotation marks and footnotes omitted).

describe the contract between the parties as an "implied" or "implied-in-fact" agreement.

The district court even took care to note that "Givaudan has not argued" that Conagen committed "a material breach" of the other requirements of Key Term 1, which "included certain management changes at Conagen and confidentiality and non-compete agreements" from certain corporate officers. *Id.* at *6. This context underscores that the district court meant what it said: "the Term Sheet constitutes … an enforceable contract that governs the promise at issue." *Id.* at *8. The district court made no determination that the parties, in the absence of a written agreement, reached an implied-in-fact agreement.

Because the district court did not decide whether the parties reached an implied-in-fact agreement, I would not do so for the first time on appeal. In my view, the trial record is not clear enough to affirm on this alternative basis. The majority asserts that the parties "manifested through their conduct" an intention to reach an implied-in-fact agreement, *ante* at 27, but the parties' course of dealing indicated the opposite intention. The terms of the circulated draft of the stock purchase agreement provided that the purchaser would agree to buy the stock "at the Closing." App'x 755. Under that agreement, the "purchase, sale and issuance of the Shares … shall take place no later than three (3) Business Days after the satisfaction or waiver of *all conditions* to the Closing." *Id.* (emphasis added). One of the conditions to the closing was the execution of an exclusivity agreement. *Id.* at 758. This draft did not show "an intention to prepare and adopt a written memorial" of a completed contract of sale. *Ante* at 31. The draft instead reflected the parties' understanding that the stock sale would not be completed until the parties resolved the other

5

conditions. Because the parties never reached a signing or a closing, the purchase of stock never occurred.

Neither Givaudan's transfer of cash to Conagen after the execution of the Term Sheet nor its communications regarding that transfer overcomes the clear import of the text of the Term Sheet and the understanding expressed in the parties' course of dealing. The transfer may have evinced Givaudan's confidence that the parties would reach an actual agreement. It does not establish either that the Term Sheet was a contract of sale or that Givaudan wanted to preempt the ongoing negotiations by executing a stock sale immediately.

Similarly, an internal presentation to the Givaudan board of directors stated "that another 5% stake for $10,000,000 has been acquired." App'x 610. But the past-tense language may have been imprecise or may have reflected Givaudan's confidence that it would reach a deal. *See id.* at 94-95, 159-160 (testimony of Christiaan Thoen that he used the past tense based on his expectation that the parties would reach an agreement). Givaudan's CEO stated in an email that "[i]n order to show our commitment I am perfectly happy to sign the term sheet on Conagen … and to effect the additional equity payment for Conagen immediately." *Id.* at 604. The most natural reading of the statement—especially in light of the overall context—is that the CEO made the payment as a gesture of good faith and high confidence that the deal would eventually close. These scattered statements do not provide strong enough evidence to overcome the text of the Term Sheet and the parties' course of dealing.

**B**

Second, the district court rejected Givaudan's unjust enrichment claim based on its determination that the Term Sheet was

6

an enforceable contract of sale. *See Givaudan*, 2022 WL 2804983, at *8 (rejecting Givaudan's unjust enrichment claim because "the Term Sheet constitutes a contract" that "governs the promise at issue"). If there was no express contract between the parties—as the court recognizes today—then the district court erred by dismissing Givaudan's claim for unjust enrichment on that basis.[3]

The majority believes that Givaudan's failure to prove damages is "dispositive on this appeal." *Ante* at 20. But Givaudan has shown that it paid $10 million in reliance on Conagen's promise to negotiate in good faith toward an exclusivity agreement. Even if that "outlay … does not neatly fit into the category of reliance damages" for a breach of contract, as the majority suggests, *id.* at 22, it would support Givaudan's equitable claim. The majority itself says that "[w]hat Givaudan appears to contemplate is rescission," which "is generally (though not always) an equitable remedy in Delaware." *Id.* at 24 & n.16. A court "granting legal rescission could declare the sale invalid and grant the plaintiffs money damages, thereby restoring them to their original position," in which case $10 million would be the appropriate measure of damages. *Alejandro & Reinholz v. Hornung*, No. 12442, 1992 WL 200608, at *3 (Del. Ch. Aug. 12, 1992). "[T]he equitable remedy of rescission," meanwhile, "results in abrogation or 'unmaking' of an agreement" or a transaction, and it "attempts to return the parties to the status quo." *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982). In such a case the specification of damages would not

---

[3] The district court purported to reject Givaudan's unjust enrichment claim on the additional ground that Givaudan received a "fair exchange for its payment." *Givaudan*, 2022 WL 2804983, at *8. That conclusion appears to have been based on the district court's understanding of the stock purchase and exclusivity agreement as severable terms. This understanding, as explained below, was incorrect.

even be required. In fact, Givaudan has sought such equitable relief in this case, and its purported failure to prove reliance damages does not preclude Givaudan from obtaining that relief. *See* App'x 28-30 (alleging in the complaint that "equity requires restitution of the advance payment from Conagen to Givaudan to prevent Conagen's unjust enrichment" and seeking "[s]uch other and further relief as the Court determines to be just and appropriate").

Rescission itself is "reasonable, appropriate, and practicable" when, as in this case, "it is possible for all parties to the transaction to be restored to the *status quo ante*, *i.e.*, to the position they occupied before the challenged transaction." *Tornetta v. Musk*, 310 A.3d 430, 547 (Del Ch. 2024) (internal quotation marks and alteration omitted). And, contrary to the majority's suggestion, "Delaware law provides that a claim for equitable rescission can be based on grounds other than fraud, misrepresentation, or mistake, including breach of contract." *Schlosser & Dennis, LLC v. Traders Alley, LLC*, No. N16C-05-190, 2017 WL 2894845, at *10 (Del. Super. Ct. July 6, 2017). "[F]raud, misrepresentation, and mistake are only 'common grounds for rescission,'" not "the exclusive grounds for which equitable rescission may be sought." *Id.* (quoting *Norton*, 443 A.2d at 4).

The district court did not seriously consider Givaudan's unjust enrichment claim—or the possibility of equitable relief—because it erroneously concluded that a written contract governed the exchange between the parties. So it is not dispositive on appeal that the $10 million payment does not look like reliance damages for a traditional breach-of-contract claim.

Whether the parties reached an implied-in-fact agreement is a question of fact that depends on "the conduct of the parties." *Cap. Mgmt. Co. v. Brown*, 813 A.2d 1094, 1098 (Del. 2002). Such a

"determination requires a fact-intensive analysis to be handled by the district court in the first instance." *Jones v. Goodrich Pump & Engine Control Sys., Inc.*, 86 F.4th 1010, 1015 (2d Cir. 2023).[4]  I would remand for further proceedings on that issue as well as for reconsideration of Givaudan's unjust enrichment claim.

## III

According to the court, the "language of the Term Sheet itself, as well as the parties' course of dealing leading up to and following its execution," demonstrated the parties' intention to treat the stock purchase agreement and the exclusivity agreement as severable from each other. *Ante* at 34; *see also id.* at 35 ("[T]he plain language of the Term Sheet militates in favor of severability."); *id.* at 39 ("[I]t is difficult to imagine a clearer 'separate assent' to the stock purchase than the one both parties—but primarily Givaudan—evinced.").

That is incorrect. The Term Sheet did not directly address the severability of its key terms—there was no reason for it to do so because the key terms were not enforceable provisions—but it expressly connected the stock purchase to the exclusivity arrangement by explaining that a "[f]urther equity stake in [Conagen] will enhance Givaudan's strategic access to the latest ... natural

---

[4] *See Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 105 (2d Cir. 2022) ("[W]hile we may be '*free* to affirm on any ground that finds support in the record, even if it was not the ground upon which the district court relied,' we have made clear that 'we *prefer* not to speculate in the first instance as to' issues not passed upon below.") (quoting *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 160 n.6 (2d Cir. 2017)); *Schonfield v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000) ("Although we are empowered to affirm a district court's decision on a theory not considered below, it is our distinctly preferred practice to remand such issues for consideration by the district court in the first instance.").

ingredients IP and sweeteners for the [Flavors and Fragrances] Field." App'x 607. Far from not "say[ing] anything about the stock purchase being conditioned on the successful entry into the exclusivity arrangement," *ante* at 33, the Term Sheet described an integrated transaction involving both the purchase of stock and the grant of exclusivity.

Neither the enumeration of separate key terms nor the specification in Key Term 1 of an amount to be paid for equity in Conagen establish that the terms were severable. Severability "is purely a question of the intent of the parties," *Tracey v. Franklin*, 67 A.2d 56, 61 (Del. 1949), so we must understand the terms in light of the parties' express statement of their intention to accomplish an integrated agreement involving a stock purchase and exclusivity rights. That statement precedes the key terms in the Term Sheet, *see* App'x 607, and it informs the meaning of Key Term 1 because we must read a contract "as a whole," *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (quoting *Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010)). "If the document as a whole makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement." *Id.* (internal quotation marks and alteration omitted). In this case, when considered as a whole, the Term Sheet indicates that the parties intended to treat the stock purchase and the exclusivity agreement as one inseverable transaction.

The majority identifies the separate drafts of the stock purchase agreement and the exclusivity agreement as evidence that the parties did not "contemplat[e] an integrated agreement containing both a stock-purchase and an exclusivity component." *Ante* at 37. But one of the conditions to the closing in the draft of the stock purchase

10

agreement was the execution of an exclusivity agreement. App'x 758. The drafts of the exclusivity agreement, in turn, explained that Givaudan and Conagen were to execute a "Common Stock Purchase Agreement" that it called "the 'Second SPA.'" *Id.* at 921, 988. "In order to induce [Conagen] to enter into the Second SPA and *to induce [Givaudan] to invest funds in [Conagen] pursuant to the Second SPA*, [Givaudan], BGN and [Conagen] hereby agree that this Agreement shall govern the rights of [Givaudan] to cause [Conagen] and BGN *to grant certain exclusive rights in the Specified IP … to [Givaudan]." Id.* (emphasis added). In other words, the draft agreements reveal that the parties understood Givaudan's expected stock purchase to depend on its expected receipt of exclusivity rights.

The majority dismisses this provision in the drafts of the exclusivity agreement as "difficult to square with" other pieces of evidence and as illustrating only "Givaudan's *subjective* view" of the agreement. *Ante* at 43. Yet the same provision appeared in the draft exclusivity agreement sent from Conagen to Givaudan on October 12, 2016. *See* App'x 921. These drafts represent "the parties' objective manifestation of assent," *Trexler v. Billingsley*, 166 A.3d 101, 103 (Del. 2017), and the record therefore shows that the parties contemplated an integrated transaction.[5]

\* \* \*

The district court clearly erred by concluding that the Term Sheet was a contract of sale and that, assuming it was a contract of

---

[5] The majority further suggests that Givaudan's communications regarding the transfer of cash demonstrated that it intended the key terms to be severable. *See ante* at 39-43. As discussed above, these communications reflected Givaudan's expectation that the parties would reach an integrated agreement.

11

sale, its terms were severable. The district court did not decide whether the parties reached an implied-in-fact agreement, and the record does not allow this court to affirm on that alternative ground. I would remand for the district court to consider the issue in the first instance and to reconsider Givaudan's unjust enrichment claim. Accordingly, I dissent.